JOHN F. HILL *vs.* GEORGE R. FINNEMORE.

Kennebec.     Opinión, May 17, 1934.

460

*C. A. Blackington,*
*Goodspeed & Fitzpatrick,* for plaintiff.
*F. Harold Dubord,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

HUDSON, J.    Action on the case to recover damages for personal injuries alleged to have been caused by defendant's negligent operation of his automobile on Silver Street in the city of Waterville on the twelfth day of September, 1932. At nisi prius the plaintiff recovered a verdict of $6,791.00. The case comes forward on motion for new trial and exceptions.

The ground of exception that the trial court erred in refusing to grant the defendant's motion for a directed verdict will be considered in connection with the motion for new trial.

## Motion for New Trial

Silver Street leads off westerly from Main Street at right angles. Its easterly end, where this accident happened, is in the congested business section of the city. On the southerly side of Silver Street is located Arbo's Garage, in front of which at the curb is a gas pump. The street here from curb to curb is thirty-one feet wide. At about eleven o'clock in the forenoon of this day, the plaintiff, proceeding westerly on Silver Street, stopped at this garage to purchase gas for his car, parking it by the southerly curb headed westerly and with its rear end about six feet westerly from the gas pump. He purchased the gas, tendered the garage man a bill in payment for it, and waited for his change.

The defendant, a Lieutenant of the Waterville police, accompanied by another police officer, Mr. Colby, was returning from an official visit farther west on Silver Street, the defendant himself driving a Plymouth coupe owned by the City, to which coupe was attached a siren. This coupe hit the plaintiff while he was at some point in the street in front of the garage, the exact location of the impact, with reference to the curb and the rear end of his parked car, being in dispute, and caused the injuries for which damages are sought.

The parties' versions of the happenings are impossible of reconciliation.

The plaintiff's account of the accident, briefly stated, is, that while standing "about five or six feet back of his car, or back of the gas pump," he saw John Ware on the other side of the street, whereupon he called to him and "started to cross the street to speak to him." At this place there was no crosswalk nor any for quite some distance in either direction. In answer to the question of his attorney to "tell the jury in your own words what you did," he said, "I looked toward Main Street and saw there was no traffic in the street and then I stepped out off from the entrance to the garage and I looked by my car. As I stepped down my first

step, there was nothing in sight and on the second step I saw this car coming rapidly toward me and I stopped that second step and made a jump to get back but he was coming at such a high rate of speed and I observed instantly that the driver had no idea of my presence there — he was looking directly the other way; — and before I could jump from there he had swerved right into where I was."

In corroboration the plaintiff produced two eye witnesses, Simpson and Dulac, who, at the time, were diagonally across the street in front of the Vigue Block, which is northeasterly of Arbo's Garage. Nothing in the case discloses any relationship to the parties, bias or prejudice upon the part of these witnesses. The gist of Mr. Simpson's testimony is that he saw the police car coming at a fast rate of speed, thirty to thirty-five miles an hour, farther down on Silver Street, and he said: "I noticed this man coming out of the garage, coming off of the sidewalk. And as I saw that second step as he turned away that coupe came in toward him and then hit him and then swerved off into the street." He also observed that the defendant was looking northerly just before the accident, not in the direction of the plaintiff.

The other corroborating witness, Mr. Dulac, close by Mr. Simpson, testified: "I saw that car" (meaning the defendant's) "kind of swerve in a little toward the curb; and then I saw this man go in the air," and later, "and there was another car here and when they got by that car it come around it and sort of come right in toward the south, the sidewalk;" also that the defendant was driving at least twenty-five miles an hour and that the plaintiff when hit was about ten feet back of his car and three feet out from the curb.

In denial of the plaintiff's contentions, the defendant insists that the accident was attributable to no negligence upon his part. He says that at a point on Silver Street, approximately one hundred sixty-five feet westerly of the gas pump, he brought the coupe to a dead stop on account of an A & P truck that was entering Silver Street from Charles Street, and then proceeded along to the point of collision at a speed from fifteen to eighteen miles per hour. He testified: "I saw a car parked headed the wrong way on our right. . . . And as we got abreast of the car this party stepped right out, one step right in front of us, and before we could realize what had

happened we struck him" and that he did not see him at all before he stepped out from behind his automobile. Furthermore, he claims that he was looking ahead, although he admitted that he had observed a blue sedan car when just beyond Charles Street and made some remark in regard to it to his companion, Mr. Colby. To quote his testimony, he said: "It had been all simonized and shone like a mirror. It attracted my attention." This blue sedan was in front of the bakery on the opposite side of Silver Street from the gas pump. He did not claim that he sounded the siren on his car and he denied that he swerved his car to the right. His statements were corroborated by Mr. Colby.

The plaintiff contends that the defendant operated his car negligently in several respects. First, that the rate of speed employed was negligent, considering the place where the car was being operated, congestion of traffic, and the time of day; second, that he did not use his siren and give proper warning of his approach at that place; third, that he was inattentive, did not look straight ahead, and gave no attention whatever to the traffic; and, fourth, that he negligently swerved to the right and struck the plaintiff. The defendant, denying these contentions, claimed, in addition, that the proximate cause of the accident was contributory negligence upon the part of the plaintiff himself in suddenly stepping out from behind his car, unexpectedly leaving a place of safety, and going in front of the defendant's car when it was too late for the defendant to check its progress in time to avoid striking him.

A very important question of fact in the case was the place where the plaintiff left the curb and stepped into the street with relation to the rear of his parked car. As to this, the evidence was in dispute. The plaintiff and his witnesses said it was some ten to fifteen feet back from the car; the defendant and his witness, Colby, just behind the car. Another important fact for determination by the jury was the plaintiff's exact location when hit with relation to the curb from which he had stepped. The plaintiff contended that he was exactly upon a white parking line, approximately three feet from the curb. The defendant, on the contrary, said he was farther out into the street. Question: "How far had he stepped out behind the right side of his car when you struck him?" Defendant's answer: "Oh, I think just about one good step."

The evidence as to what the plaintiff did to see if there were any traffic as he took those steps out into the street came only from the plaintiff and his witnesses. It was that the plaintiff looked toward Main Street and saw no car approaching, saw nothing in sight as he took his first step, although he looked, and on the second step saw the defendant's car coming rapidly toward him, whereupon he attempted to step backward but was hit in so doing when the defendant swerved his car into him.

The jury, by its verdict, must have found the defendant guilty of negligence on at least some one of the above contentions and have found the plaintiff guiltless of contributory negligence.

In passing upon this motion for a new trial, we must determine whether or not the jury's verdict is manifestly and palpably against the evidence. If it is not, the verdict must stand, even though the Court itself might have arrived at a different result. *Chenery* v. *Russell, Russell* v. *Chenery*, 132 Me., 130, and cases therein cited on page 134. A careful study of the record convinces the Court that there was sufficient credible evidence to justify the jury in finding negligence upon the part of the defendant, in this regard at least; that without the exercise of due care to observe the road in front of him, negligently he swerved his car in toward and collided with the plaintiff. "Thoughtless inattention on the highway, as elsewhere in life, spells negligence." *Callaghan* v. *Bridges Sons, Inc.*, 128 Me., 346, 349; *Rouse* v. *Scott*, 132 Me., 22, 24.

The jury no doubt believed that not only was he inattentive to his driving in not looking ahead, but that his mind was otherwise concentrated on the "shiny" sedan on the north side of the street, which, he admits, "attracted his attention."

If mere inattention spells negligence, voluntarily diverted attention with a preoccupied mind manifests negligence in an even greater degree. Thus is explained the fact, and no doubt the jury found it to be a fact, that in passing the plaintiff's parked car he swerved his car to within about three feet of the southerly curb. If the jury found as a fact that the plaintiff when hit was from ten to fifteen feet back of the parked car, it was entirely possible for this to occur without the defendant's car touching the plaintiff's car in passing.

In this case, the swerving itself indicates strongly lack of proper guidance of the car by the ordinarily careful and prudent driver. No doubt it did result from inattention or from diversion of the mind, for no excuse is offered for turning the wheels of this car toward the plaintiff when there was plenty of room in the street for safe passing without any collision whatsoever.

## Contributory Negligence

Was the plaintiff himself in the exercise of due care as he proceeded outward from the curb? Several Maine cases have dealt with the duty of care that rests upon such pedestrian. In the latest of these cases, *Smith* v. *Joe's Sanitary Market, Inc.*, decided December 23, 1933, and now reported only in 169 A., 900, the Court sustained direction of a verdict for the defendant where the plaintiff "jumped as if to cross the street directly into the path of the truck and was immediately hit."

In *Cooper & Company* v. *Can Company*, 130 Me., 76, the Court held that a verdict in favor of a plaintiff who "stepped into the path of the swiftly moving car" could not stand because of "utter lack of due care."

In that case from *Simeone* v. *Lindsay*, 22 Del., 224, 65 A., 778, our Court quoted with approval this language: "If a person walks into a danger that the observance of due care would have enabled him to avoid and is thereby injured, he would be guilty of contributory negligence."

Justice Bassett, in *Clancey* v. *Power & Light Company*, 128 Me., 274, on page 278, said: "A pedestrian about to cross a street must use the care and prudence of a prudent man under like circumstances, having in mind his own safety. The law does not undertake further to define the standard. It does not undertake to say 'how often he must look or precisely how far or when or from where.' . . . Failure to look or listen may be strong evidence of negligence. . . . Mere looking is not sufficient. One is bound to see what is obviously to be seen." Compare *Shaw* v. *Bolton*, 122 Me., 232; *Sturtevant* v. *Ouelette*, 126 Me., 558; *Blanchette* v. *Railway*, 126 Me., 40.

One is not guilty of negligence as a matter of law in attempting to cross a street where there is no cross walk, although there is a

cross walk some distance away. *Page* v. *Moulton*, 127 Me., 80, 81 ; *Clancey* v. *Power & Light Co.*, supra.

"Sidewalks are for the exclusive use of pedestrians but the remaining portion of the highway is not for the exclusive use of vehicles. In the absence of statutory or municipal regulations affecting the question, the pedestrian has equal rights in the street with the operator of an automobile." *Cole* v. *Wilson*, 127 Me., 316, 319.

In the case at bar, the jury may well have found from credible evidence in the case that the plaintiff, at the time he was hit by the defendant's automobile, was out in the street only a distance of approximately three feet from the curb and from ten to fifteen feet back of his car ; that, being in that position, he had not placed himself at a point of danger ; did not jump out in front of the defendant's car, and that the sole cause of the accident was the fact that the defendant negligently swerved his coupe to the right until it there collided with the plaintiff. The finding of such facts clearly distinguishes this case from the cases above cited.

It is true that the plaintiff's own evidence shows that in looking westerly on Silver Street he saw the defendant's car approaching, but, the plaintiff then being only from one to two steps from the curb, with his own car between him and the oncoming car, the jury again might well have found that he had no reason to believe that the defendant would alter his course and run into him. As soon as the plaintiff saw the defendant commence to swerve his car toward him, credible evidence there was in the case to have warranted the jury in believing that the plaintiff with due care then attempted to step backwards in self-protection. This Court can not hold that the jury committed any manifest or palpable error in finding either negligence of the defendant as the proximate cause of the plaintiff's injuries or that the plaintiff himself was guiltless of contributory negligence. The Court below did not err in refusing to direct a verdict for the defendant.

## Damages

Another ground for a new trial urged by the defendant is "because the damages are excessive." The verdict returned, as above stated, was for $6,791.00. The evidence as to the extent of plain-

tiff's injuries and their effect upon him came from the plaintiff himself and his witnesses, Dr. Hill, a specialist, and Dr. Poulin, his family physician, a general practitioner. No medical testimony was offered by the defense.

It appears in the record that up to the time of the trial in June, 1933, the plaintiff had not been able to do any work. In the automobile business as a salesman, forty-seven years old, with eighteen years experience, he claimed that his prior average weekly earnings were approximately $75.00. His expenses incurred at the hospital for medical attendance and treatment, charges of a man in his service in the woods while attempting a more speedy recovery, totalled about $250.00. His ability to earn in the future is problematical, depending on time of recovery, if recovery is accomplished, and its extent. Before the accident he enjoyed perfect health.

Dr. Poulin, the attending physician at the time of the accident, in description of his then condition, said: "His face and head were covered with blood and he was pale and looked quite weak. He had a contused lacerated wound on the right side of the scalp and also a contusion of the right shoulder and the left leg below the shin." He was not then fully conscious. The head contusion was from two to two and a half inches and required closing with sutures. The doctor testified that the plaintiff received "a severe injury to his brain, a severe shock to the brain" and that subsequently he made complaints right along as to nervousness, crying spells and dizziness, which, it is true, were subjective symptoms but consistent with brain injury. He considered him unable to work, and said he acted entirely differently after the accident; that he is "despondent, don't seem to have any courage; he is nervous." Because the plaintiff's symptoms of which he was complaining, headaches and dizziness, did not clear up, Dr. Poulin had him examined by the specialist, Dr. Hill.

Dr. Hill's first examination of him was on October 12th, one month after the accident. According to the specialist, he then complained of headaches and dizziness. He found that the plaintiff then had edema of the brain and that "the field of that left eye was contracted in toward the center" so that there was "a contraction of his field of vision on the left side."

He saw the plaintiff next on October 18th. At that time "the field had returned to normal," but nevertheless he stated that his examination indicated "there had been an injury to the brain." The edema had cleared up, but, he said, "The edema even if cleared up might leave some permanent injury to the brain cells or it may leave naturally or last an indefinite length of time, affecting him in a general nervous instability following the injury." Subjective symptoms of "general disability in the main, dizziness and headaches" were not inconsistent with the injury he received. He could not predict how long the plaintiff would be affected in the future. Finally, he testified that the symptoms complained of, in his judgment, were due to "the injury to the brain."

There was considerable evidence as to pain and suffering.

With reference to damages in this form of action, our Court, in Conroy v. Reed, 132 Me., 162, 166, has very recently said: "We are fully aware that as a general rule in the trial of civil cases the assessment of damages is for the jury and the parties are entitled to their judgment upon that issue. When it appears, however, that the jury have disregarded the testimony or acted under some bias, prejudice or improper influence with the result that the damages awarded are either excessive or inadequate, then it is the duty of the Court to set aside the verdict." And in that case the Court set aside the verdict because of inadequacy.

Whether or not the verdict in this case is excessive, in our judgment, depends on what the future holds in store for the plaintiff as a result of the brain injury he received. Questions for answer by the jury related to the extent of that brain injury, its effects and their reasonably probable duration. If the plaintiff's brain is still affected, although subjective symptoms only are now discoverable, and as a result, in the future he is to be subject to frequent headaches and spells of dizziness and suffer from attacks of despondency and melancholia, and be unable to resume his work, the verdict was not excessive. If, even for an indefinite length of time, the plaintiff is so to be afflicted, that particular kind of an affliction which may reasonably be expected not only to deprive him of his future earning capacity but to destroy his peace of mind, his future happiness and contentment of living, is not over-

compensated by this verdict. What constituted fair compensation to reimburse this plaintiff for the injuries he received proximately as a result of the defendant's tortious act was for the jurors, who had before them the plaintiff, whom they could observe, as well as the witnesses to whose testimony they could give such weight as they thought reasonably should be given. Nothing appears in the record to show that the jury "disregarded the testimony or acted under some bias, prejudice, or improper influence." Neither was there any evidence to justify the jury in believing that the plaintiff testified falsely in regard to his injuries, their effect upon him and his mental condition.

The motion for a new trial can not be granted on the ground that "the damages are excessive."

### Exceptions

The first exception, as to the overruling of the defendant's motion for a directed verdict, has already been considered in connection with the motion.

The defendant excepts also to the ruling of the Court at the end of the trial refusing to allow three defense witnesses to testify, namely, John Ware, Gabrial Joseph and the defendant himself.

A careful study of the evidence and the long colloquy between the Court and counsel, conducted in the absence of the jury, warrants the finding of these facts with relation to this exception.

The plaintiff introduced his evidence and rested; the defendant likewise. The plaintiff himself then took the stand in rebuttal. On re-cross examination he denied that he had called John Ware to Court that day; that he had seen him in the Court House during the day, although he thought he had seen him in the attorneys' room. He said he did not know whether his attorney had called Ware there or not; that he himself had had no conversation with Ware that day, and that, to his knowledge, he was not there in connection with his case, for personally he did not request him to come, and that, as a matter of fact, he had never asked him to come as a witness.

At the end of this re-cross examination, the Court "adjourned to 9:30 Wednesday, June 14, 1933." The record of the case before

adjournment does not disclose either that the plaintiff had anything further to introduce in rebuttal or that the defendant wished to introduce any evidence in sur-rebuttal.

The next morning the attorney for the defense announced to the Court that he had "some more testimony in rebuttal." To this the plaintiff objected, saying: "I understood that the testimony was all closed and I have let all my witnesses go." Then followed the long colloquy above referred to, by which it appeared that the defendant sought to introduce evidence tending to prove the following facts:

1. By John Ware that "he was summoned here by the plaintiff." (He sought also "to inquire of him regarding the information which he may have in connection with the accident.")

2. By the defendant himself "the exact location of the catch basin, the purpose of this being indirectly to contradict the testimony of the plaintiff himself that he did not park the car close to the tank because he wished to go beyond the catch basin." Also by the defendant that "when standing in the doorway of the Vigue Block or on the sidewalk of the Vigue Block and looking westerly on Silver Street the vision is obscured by any automobile that is parked westerly of the Vigue Block on the northerly side of Silver Street."

3. By Gabrial Joseph that "he was standing by or in a parked automobile on the north side of Silver Street somewhere opposite Arbo's Garage but that he did not see the accident but did see Mr. Hill lying in the road after the blow." This was offered "in contradiction of Mr. Hill himself as to where he was when he was struck and also in contradiction of both Mr. Dulac and Mr. Simpson as to where his body was after the blow."

Also by Mr. Joseph "the location of the Finnemore car after the accident" in rebuttal of the testimony of Simpson and Dulac.

The colloquy discloses that the defendant's attorney knew that Ware was in the attorney's room the day before and in the Chief Justice's office in the Court House, although he made no effort then to have him appear as a witness. Before adjournment that night neither counsel informed the Court that he had other testimony to offer the next morning. Upon adjournment counsel for the plaintiff, "still holding his witnesses" until he should find out

whether they would be needed the next morning or not, conferred with the Court and was informed that the case was closed, whereupon he remarked to the Court: "I am glad because I can let my witnesses go" and they were finally excused and were not present in court the next morning.

In denial of the request to introduce the above testimony, the Trial Judge said: "The Court always endeavors to admit testimony for the purpose of bringing about justice. But it must, of course, be guided by legal principles and rules of procedure in trying cases. From examination of the testimony that the defendant desires to offer at this time, I do not feel that the cause of justice requires it and I do believe that it would not be in accordance with the rules of procedure of our Court."

The trial court, no doubt, in referring to "guidance by legal principles and rules of procedure" had particularly in mind Rule of Court XXXVI, which provides: "A party having rested his case can not afterwards introduce further evidence, except in rebuttal, unless by leave of Court." "Rules of Court" lawfully established "have the force of law and are binding upon the Court, as well as upon parties to an action, and can not be dispensed with, to suit the circumstances of any particular case." *Cunningham* v. *Long*, 125 Me., 494, 496; *Fox* v. *Conway Fire Ins. Co.*, 53 Me., 107; *Nickerson* v. *Nickerson*, 36 Me., 417; *Mayberry* v. *Morse*, 43 Me., 176.

After the defendant had rested his case, the plaintiff presented his rebuttal and rested, following which the defendant, by reason of said Rule of Court, as a matter of right, could have introduced only testimony rebutting or tending to rebut the plaintiff's rebuttal. No other testimony was open to him "unless by leave of Court" within its judicial discretion. *Emery* v. *Fisher*, 128 Me., 124, 125, and citations therein. That was the situation that morning when these men were offered as witnesses. Inasmuch as the record up to that time did not show that both parties had finally rested, the case was still open, not closed, for further introduction of evidence, if legally receivable. The statement of the Court after adjournment to plaintiff's counsel that the case was closed, not made in Court nor consented to by the defense, did not bind the defendant.

Two questions, then, arise for answer:

First: Did the proffered testimony of these witnesses rebut or tend to rebut the plaintiff's rebuttal testimony so as to make it admissible as a matter of right? A careful examination convinces us that it did not. If anything, it contradicted or tended to contradict the plaintiff's evidence in chief and so should have been presented by the defendant as a part of his evidence in chief.

Second: This evidence not being admissible as a matter of right, had the Court the right in the exercise of its discretion to admit it? Our answer is yes, excepting as to that part of Mr. Ware's proffered testimony offered to contradict Mr. Hill's statement that he had not summoned him as a witness. This was inadmissible because the defendant was bound by Mr. Hill's answer on this collateral matter. *State* v. *Benner*, 64 Me., 267, 287; *State* v. *Priest*, 117 Me., 223, 230; *Bessey* v. *Herring*, 121 Me., 539.

In *Hathaway et als* v. *Williams*, 105 Me., 565, our Court held that exceptions do not lie to the exclusion of non-rebutting evidence offered by a plaintiff in rebuttal after the close of the defendant's evidence. In that opinion, the Court quoted this language from *Cushing* v. *Billings*, 2 Cush., 158, 160: "The orderly course of proceeding requires that the party, whose business it is to go forward, should bring out the strength of his proof, in the first instance; but it is competent for the judge, according to the nature of the case, to allow a party who has closed his case to introduce further evidence. This depends on the circumstances of each particular case, and falls within the absolute discretion of the judge, to be exercised or not as he thinks proper." "Rule XXXIX, Sup. Jud. Court." The present Rule XXXVI was then Rule XXXIX.

Again, in *Sweeney* v. *Cumberland County Power & Light Co.*, 114 Me., 367, it is held that after a party has rested his case he can not afterwards introduce further evidence except in rebuttal, unless by leave of Court, and that testimony in rebuttal must be confined to new matter brought out in his adversary's case and is not admissible unless by leave of Court if it merely tends to corroborate the facts brought out as part of his own case in chief and is merely cumulative in respect thereto.

In spite of the said quotation from the Massachusetts Court in *Hathaway* v. *Williams*, supra, in the later *Sweeney Case*, 114 Me., on page 371, our Court says: "It is doubtful if exceptions would

lie *unless error amounting to abuse of judicial discretion is manifest.*"

Did the presiding Justice abuse his discretion in not permitting the introduction of this testimony?

As to judicial discretion with reference to the continuance of a case, we quote from *Charlesworth* v. *American Express Co.*, 117 Me., 219, on page 221: "The term judicial discretion does not mean the arbitrary will and pleasure of the Judge who exercises it. It must be sound discretion exercised according to the well established rules of practice and procedure, a discretion guided by the law so as to work out substantial equity and justice. It is magisterial, not personal discretion. The chief test as to what is or is not a proper exercise of judicial discretion is whether in a given case it is in furtherance of justice. If it serves to delay or defeat justice it may well be deemed an abuse of discretion. Incidents attending the progress of a trial are necessarily addressed to the discretion of the Court. 'That discretion is not to be exercised arbitrarily but to be guided and controlled, in view of all the facts, by the law and justice of the case subject only to such rules of public policy as have been wisely established for the common good.' *York & Cumberland R. R. Co.* v. *Clark*, 45 Me., 151, 145." See also *Hersey* v. *Weeman*, 120 Me., 256, 262; *Fournier-Hutchins* v. *Tea Company*, 128 Me., 393, 403.

In *Rioux* v. *Portland Water District*, decided January 17, 1934, now reported in 170 A., page 63, on page 64, in dealing with the discretion of the Court to order a mistrial in a case, it is said: "When the determination of any question rests in the judicial discretion of the trial court, the exercise of that discretion cannot be refuted by an appellate court unless it is made to appear that the decision was clearly wrong or that it was based upon some error in law. . . . It is abuse of judicial discretion which is open to exceptions."

"It will be presumed that the ruling of a Judge receiving or rejecting evidence was right unless the exceptions show affirmatively it was wrong." *Sweeney* v. *Cumberland County Power & Light Co.*, supra; *Parmenter* v. *Coburn*, 6 Gray, 509, 510; Bowers' Judicial Discretion of Trial Courts, Section 17, page 32.

"The party complaining of the abuse has the burden of showing

it. . . . The reason usually advanced for the declaration and application of this rule is that the trial tribunal has superior advantages for knowing the exigencies of the case under which the order attacked has been made, has seen the parties, observed the witnesses, followed the minutia of the trial as it developed, and can know better than an appellate court what will and what will not further the cause of justice in the case before it." Bowers' Judicial Discretion of Trial Courts, *supra,* Section 18, page 33.

The defendant utterly fails in this case to show that the trial court abused its discretion in its said ruling. While it is true that the facts sought to be introduced were not permitted to be presented to the jury, for this the defendant is himself responsible.

Reference has already been made to a part of the Ware testimony.

As to his other proffered testimony, Ware was available and known so to be, by the defense, at the time the evidence of the defense in chief was put in, to which it properly belonged. It is noted that counsel for the defense frankly stated that he had no knowledge of what Mr. Ware's testimony would be. It does not appear, therefore, that by the exclusion of this testimony the defendant is prejudiced.

As to the defendant's proffered testimony with relation to the location of the catch basin, and possibility of vision from the front of the Vigue Block, this properly was a part of his defense in chief. Likewise Joseph's testimony.

Some of this testimony was cumulative, of only indirect bearing on the issues in the case, and all of it was available for use at the proper time for its introduction, at which time it was as well known to the defendant as later when offered and excluded. The defendant had not discovered new witnesses with previously unknown evidence.

"There is no abuse of discretion in refusing to reopen a case for the admission of merely cumulative evidence, evidence to refute other evidence immaterial to any issue, or evidence the existence and materiality of which were known to the party offering it before the close of the case and which it does not appear that he could not have produced before the close of the case." 4 C. J., page 821, and cases cited therein.

Defendant in his brief cites and relies on the following language in 4 C. J., page 817: "The principal rule for the exercise of this discretion, as has been said by an eminent author, is that material testimony should not be excluded because offered by the plaintiff after the defendant has rested, although not in rebuttal, unless it has been kept back by a trick and for the purpose of deceiving the defendant and affecting his case injuriously." Directly in point here, however, is the very next sentence, namely: "It is, of course, a limitation on the exercise of this discretion that it must not be exercised to the prejudice of the adverse party." The plaintiff's witnesses had been excused by permission of the Court and were not in Court when this testimony was offered. The presiding Justice may very well have thought that to allow the introduction then of this testimony, all of which could have been offered the day before, when, if at all, it should have been, would have been very prejudicial to the plaintiff and his cause in the absence of his witnesses.

The long colloquy, comprising eleven pages of the printed record, evinces the very earnest desire upon the part of this presiding Justice to deal with this matter not only fully informed of the situation but with a real desire to give to each litigant his full measure of justice. The reason for his decision he succinctly states to be because he did not feel that the "cause of justice required it" or "it would be in accordance with the rules and procedure of our Court."

In conclusion, we do not hesitate to say that the Justice not only did not abuse his discretion but exercised it wisely, in accordance with the law, and "in the furtherance of justice."

*Motion and exceptions overruled.*