STATE of Maine

v.

**Francis W. WHITE, Sr.**

Supreme Judicial Court of Maine.

Argued Jan. 13, 1983.

Decided May 24, 1983.

James E. Tierney, Atty. Gen., Wayne S. Moss (orally), James McKenna, James M. Bowie, Linda S. Crawford, Matthew F. Dyer, Asst. Attys. Gen., Augusta, for plaintiff.

Goodspeed & O'Donnell by Joseph M. O'Donnell (orally), David A. Cloutier, Augusta, for defendant.

Before McKUSICK, C.J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

After a jury trial in Superior Court, Knox County, Francis White, Sr. was found guilty of the murder, 17–A M.R.S.A. § 201(1)(A) & (B), of his two-month old son, Francis, Jr. On appeal, White raises numerous claims of error. We affirm his conviction.

### FACTS

In April 1980, Francis White, Jr. was born to defendant and Margo McKenna, an unmarried couple living together in Gardiner. Early on the morning of June 11, 1980, White ran from their phoneless apartment to request emergency medical help at the Gardiner Public Safety Building. A rescue squad responded and found the baby warm but not breathing and without a pulse. Cardiopulmonary resuscitation (CPR) was immediately administered and the baby rushed to the hospital, where he lived on a respirator until his death on July 29.

1. 17–A M.R.S.A. § 201(1)(A)

Emergency room physicians noted no external signs of trauma and their original diagnosis was near miss crib death (SIDS—sudden infant death syndrome). X-rays, however, revealed numerous (32) fractures, which were determined to have resulted from at least three episodes; one occurring the night the baby was admitted to the hospital, one about three weeks prior to that date, and one about four to six weeks prior to admission. The baby had suffered arm and leg fractures, rib fractures, and "avulsion" fractures (fractures at the joints of the long bones caused by violent shaking). Cause of death was listed as multiple bone fractures with post traumatic cerebral necrosis (brain damage due to lack of oxygen).

White was indicted for murder and McKenna for manslaughter. At the close of all the evidence in their joint trial, the presiding justice, upon McKenna's motion, ordered a judgment of her acquittal.

### I. *Depraved Indifference Murder Statute*

White's indictment charged him with either "intentionally or knowingly" having caused the death of Francis White, Jr.[1] or "engag[ing] in conduct which manifested a depraved indifference to the value of human life and which in fact caused the death of Francis White, Jr."[2] At trial, White unsuccessfully moved for the dismissal of the "depraved indifference" charge, claiming that it was unconstitutional as applied to him. Following his conviction under both alternatives, White again raises constitutional objections to Maine's depraved indifference murder statute.

First, White contends that depraved indifference murder is not rationally distinguishable from the crime of manslaughter, 17–A M.R.S.A. § 203, and that the more severe penalty possible for depraved indifference murder is thus necessarily arbitrary

2. 17–A M.R.S.A. § 201(1)(B)

and therefore invalid. In *State v. Crocker,* 435 A.2d 58, 63–67 (Me.1981), however, we explicitly rejected such an attack. In *Crocker,* we discussed the differences between the two crimes and concluded that, although they differ only by "a matter of degree," *id.* at 67, they *are* constitutionally distinguishable.

White's second argument is that " 'a person of ordinary intelligence' could not 'reasonably understand' " that his conduct was prohibited by the depraved indifference statute. *See State v. Parker,* 372 A.2d 570, 573 (Me.1977) (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996 (1954)). He contends that, in light of medical testimony that many persons are not aware that vigorous shaking may be harmful to a baby, "the ordinary person ... could hardly have been expected to know that the risk was substantial."

That extremely vigorous shaking of a baby can, alone, constitute depraved indifference is noted in W. LaFave & A. Scott, Jr., *Criminal Law* § 70 at 543 (1972). From the evidence presented at trial, moreover, the jury could have concluded that White shook the baby with "severe to very, very, very severe" force, that he did so on at least three occasions, and that the baby had, at least once before, briefly stopped breathing. We therefore conclude that the depraved indifference statute gave the defendant adequate notice that his conduct in question was proscribed.

## II. *Incriminating Statements*

On October 7, 1980, following his indictment for the baby's death, White was arrested by State Police Detective Richard Cook and taken to the Kennebec County Sheriff's Office. Cook, despite knowing that White was represented by counsel and that White's counsel had requested Cook not to question White, then asked White if he understood the nature of the charges against him. As White began to cry and make incriminating statements, Cook took out his note pad to record White's remarks and suggested that White "probably should hold his statements back." [3]

Before trial, White moved to suppress his statements on the grounds that they violated both his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination. Following a hearing in chambers, the presiding justice denied White's motion, holding that Detective Cook's initial question to White did not constitute interrogation and that "[w]hatever happened thereafter was blurted out by the defendant and consently [sic] given, and I find that [White's statements] were voluntarily given beyond a reasonable doubt."

### A. *Sixth Amendment Right to Counsel*

■ The Sixth Amendment requires suppression of statements made when the

---

**3.** At trial, Detective Cook responded as follows to questioning by the State's attorney:

Q When you got to the Sheriff's Office, what happened?
A I asked Mr. White if he had any questions of me regarding the charges to which he was charged. I wanted to be sure in my mind that he understood exactly what he was being charged with.
Q And at the time that you asked him that question, what did he say?
A He started crying. He said that he wouldn't intentionally hurt his son, but could have hurt his son because he was in a panic.
Q Now, did you have any other conversation with him at that time?
A Yes.
Q What was that?

A He couldn't understand why he was being arrested. I then cautioned him of the fact that he had an attorney and didn't have to talk. In fact, I cautioned him on more than one occasion.
Q And did you have basically any further conversation with him that day?
A Just the fact that I explained to him that you had to be careful when you are handling children.
Q What did he say?
A He said that he had handled hundreds of babies and babysat all the time, and that's when I cautioned him again that he had an attorney and that he probably should hold his statements back.
Q Did he say anything else about babies at that time?
A No, he did not.

State intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel. *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115, 125 (1980); *see Brewer v. Williams* 430 U.S. 387, 400–01, 97 S.Ct. 1232, 1240–41, 51 L.Ed.2d 424, 437–38 (1977) *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246, 250 (1964).

On appeal, the presiding justice's ruling on the admissibility of a confession will be upheld if "the evidence in the record provides rational support for the conclusions he reached." *State v. Bleyl,* 435 A.2d 1349, 1358 (Me.1981); *see State v. Collins,* 297 A.2d 620, 625 (Me.1972). Our review of this record fails to convince us that the presiding justice erred in finding no violation of White's Sixth Amendment rights.

Although the presiding justice did not explicitly frame his ruling in terms of *Henry,* he did rule that Detective Cook's asking whether White understood the charges against him "was a proper question" and that White's statements were all given voluntarily. The justice would have been warranted to conclude that Cook's initial question to White was a routine formality and that Cook's suggestions that White refrain from speaking absent his attorney, while not exceptionally vigorous, were not at all intended to elicit incriminating responses. Cook's remark that "you had to be careful when you are handling children" did not constitute exemplary police conduct; we do not, however, find that as a matter of law it was "deliberately and designedly set out to elicit information" from White. *See Brewer v. Williams,* 430 U.S. at 399, 97 S.Ct. at 1240, 51 L.Ed.2d at 436–37.

### B. *Fifth Amendment Privilege Against Self-Incrimination*

White also argues that his statements were involuntary and were the result of custodial interrogation in violation of his right to counsel. Again, however, we find that the record provides ample support for the presiding justice's conclusions that White's statements were both voluntary and not the result of interrogation. *Cf. State v. Theriault,* 425 A.2d 986, 989 (Me. 1981).

White notes that, in *State v. Estes,* 418 A.2d 1108, 1111 (Me.1980), we cited the Supreme Court's holding in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–08 (1980), that "interrogation" refers "not only to express questioning, but also to any words or actions on the part of police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." In *Estes,* however, we also noted that "[b]rief, routine questions posed to a suspect during 'booking' procedures, for example, do not constitute 'interrogation.'" 418 A.2d at 1111 (quoting *State v. Simoneau,* 402 A.2d 870, 873 (Me.1979)). The presiding justice did not err in categorizing Detective Cook's remarks under the latter heading.

Finally, White contends that his statements were not "the product of free will and rational intellect," *State v. Caouette,* 446 A.2d 1120, 1123 (Me.1982), and therefore not voluntary. *See Collins,* 297 A.2d at 626. The only evidence of White's mental state, however, is that he began crying after Detective Cook asked if he understood the charges. This, alone, is insufficient to negate the presiding justice's conclusion that White's statements were voluntarily given.

### III. *Surprise Witnesses*

On Friday, September 24, 1981, two days into White's trial and after the State had presented most of its medical testimony, the State announced that it had just located two additional witnesses.[4] Ralph Robbins and Shirley Flye had lived above White and McKenna's apartment and were to testify that they heard White, during

---

4. White does not contest the presiding justice's conclusion that the State did not violate M.R.

Crim.P. 16 in not disclosing the witnesses earlier.

several arguments with McKenna, threaten the baby's life. After that disclosure, the State made the witnesses available to the defendants.

The presiding justice noted that the testimony was extremely damaging to White's case and took White's objections to its admission under advisement. On Monday, the justice heard the witnesses' voir dire testimony and decided to permit the testimony to be admitted; he further ordered a continuance of the trial until that Thursday. White appeals from the denial of his motions to exclude the witnesses' testimony, for a mistrial, and for a longer continuance.

Each of White's motions was addressed to the discretion of the presiding justice. *See State v. Stinson,* 424 A.2d 327, 332 (Me. 1981) (motion for continuance); *State v. Baker,* 423 A.2d 227, 231 (Me.1980) (motion for mistrial); *State v. Rich,* 395 A.2d 1123, 1130 (Me.1978), *cert. denied,* 444 U.S. 854, 100 S.Ct. 110, 62 L.Ed.2d 71 (1979) (motion to exclude); *State v. Ifill,* 349 A.2d 176, 181 (Me.1975) (motion for continuance).

In each case, we find no abuse of that discretion. Even with the surprise introduction of the new witnesses, White still had six days to prepare for their testimony. *Cf. Rich,* 395 A.2d at 1131 (a week was sufficient time to prepare for surprise witnesses); *Ifill,* 349 A.2d at 181 (same). Further, the presiding justice voir dired the witnesses, giving White a full opportunity to cross-examine them, and then granted a two-day continuance to allow White further preparation time. Finally, in response to the justice's request for details of how the new testimony prejudiced White's defense strategy, White gave no specific reasons but only suggested broad areas of law that might otherwise have been explored.

### IV. *Withdrawal of Counsel*

■ At the time of trial, State's witness Shirley Flye was a client of White's co-counsel Stephen O'Donnell in an unrelated civil matter. Claiming that White was entitled "to counsel free of conflict and from any appearance of conflict," both Stephen O'Donnell and White's other co-counsel, Joseph O'Donnell, moved to withdraw from their representation of White. Finding no indication of actual prejudice or conflict of interest, we affirm the presiding justice's denial of their motion. *See Zuck v. Alabama,* 588 F.2d 436, 438–40 (5th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979); *United States v. DiCarlo,* 575 F.2d 952, 957 (1st Cir.1978); *United States v. McClean,* 528 F.2d 1250, 1257–58 (2nd Cir.1976); *United States v. Jeffers,* 520 F.2d 1256, 1264–66 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976); *Commonwealth v. Geraway,* 364 Mass. 168, 170–74, 301 N.E.2d 814, 815–18 (1973); *cf. Geraway,* 364 Mass. 176–86, 301 N.E.2d at 819–25 (Tauro, C.J., dissenting).

Flye's cross-examination was conducted wholly by Joseph O'Donnell. He did not represent Flye at the time of trial, apparently never had represented her, and he was, at no relevant time, a partner or associate of Stephen O'Donnell. No direct or vicarious conflict of interests thereby required that Joseph O'Donnell be granted leave to withdraw. Moreover, because Stephen O'Donnell was not professionally affiliated with Joseph and because Stephen took no part in Flye's cross-examination, there could be no conflict of interest arising from Stephen's dual representation of Flye and White. Finally, our review of the record persuades us that White's counsel did, in fact, fully and vigorously cross-examine Flye.

### V. *Motion to Reopen*

After the close of the evidence, White moved to reopen the case to call Margo McKenna as his witness. As an offer of proof, White presented a statement taken by a State Police officer from a fellow prisoner of McKenna who claimed to have spoken with McKenna about White and the baby. Although we find that the presiding justice's refusal to reopen the case constituted error, we find the error harmless.

White's motion to reopen was controlled by M.R.Crim.P. 26(c): "A party who has

rested his case cannot thereafter produce further evidence . . . unless by leave of court." Our review on appeal is limited to determining whether the presiding justice's ruling constituted an abuse of discretion. *State v. Colomy,* 407 A.2d 1115, 1119 (Me. 1979); *Hathaway v. Williams,* 105 Me. 565, 566–67, 75 A. 129, 130 (1909); 3 Glassman, *Maine Practice: Rules of Criminal Procedure Annotated* § 26.15 (1967).

■ In ruling on a motion to reopen, a presiding justice should consider several factors. The decision to reopen the evidence necessarily involves a weighing process; no one element will be dispositive. Among the factors the justice should weigh are (1) the potential prejudice to the opposing party, *Hill v. Finnemore,* 132 Me. 459, 474, 172 A. 826, 834 (1934); *United States v. Larson,* 596 F.2d 759, 778 (8th Cir.1979); (2) the probative value of the proffered evidence, including the new witness's vulnerability on cross-examination, *Sellars v. United States,* 401 A.2d 974, 980 (D.C.1979); *see Hill,* 132 Me. at 472, 172 A. at 832; *State v. Wolf,* 44 N.J. 176, 188–92, 207 A.2d 670, 677–79 (1965); *State v. Allen,* 19 N.C.App. 660, 662–63, 199 S.E.2d 706, 707–08 (1973); and (3) the moving party's excuse for the untimeliness of its offer. *United States v. Bayer,* 331 U.S. 532, 538–39, 67 S.Ct. 1394, 1397, 91 L.Ed. 1654, 1659 (1947); *Larson,* 596 F.2d at 778; *Hill,* 132 Me. at 474, 172 A. at 834.

■ In the instant case, there is no evidence in the record, and the State does not argue, that admission of McKenna's testimony would have prejudiced the State's case. There is also no evidence in the record that the presiding justice ever weighed the probative value of the proffered evidence.

The presiding justice apparently rested his refusal to reopen the case on the tardiness of White's motion to reopen.[5] While the record does not articulate the justice's analysis, there are two potential bases for such a ruling. First, as the State argues, perhaps White should have called McKenna during his case in chief, despite the possibility that she might have invoked her Fifth Amendment rights in refusing to testify. Second, the justice may have concluded that White's motion was untimely because McKenna's motion for judgment of acquittal was granted immediately following noon recess on a Friday, while White's motion to reopen was not made until Monday morning after a discussion in chambers about jury instructions in the case.

White, however, need not have established McKenna's unavailability by attempting to call her to the stand during his case-in-chief. McKenna's failure to take the stand in her own behalf during the trial amply justified a conclusion that she was also unavailable as a witness for White. Further, it was the presiding justice's own error that resulted in McKenna remaining a defendant, and therefore unavailable, throughout the trial. Although McKenna moved for a judgment of acquittal at the close of the State's case-in-chief, the justice reserved his ruling until the close of all the evidence. As we have previously noted, however, "the mandatory language in M.R. Crim.P. 29(a) plainly contemplates that the Superior Court *shall* rule upon such a motion before the defendant has to decide whether to proceed with his defense." *State v. Smith,* 389 A.2d 314, 316 (Me.1978) (emphasis in original).

---

**5.** The presiding justice responded to White's motion to reopen by stating "No, I'm afraid it's a little late." He then conducted an off the record discussion, the contents of which are nowhere referred to in the record. Back on the record, White then made his offer of proof and, after both parties argued briefly on White's motion, the justice said, "I think everybody has forgotten one thing—Margo McKenna had an attorney, and he did not put Margo McKenna on the witness stand. If he was as sure of the

fact that her testimony would lead not only to her acquittal, but to his acquittal, I am quite sure that he would have put her on the witness stand." It is unclear the extent to which the justice relied on this observation. Such speculation as to McKenna's motives for failing to take the witness stand while still a defendant in the trial, however, would clearly be an inappropriate foundation for a decision on whether to reopen White's case.

From the Friday afternoon when the presiding justice granted McKenna's motion for judgment of acquittal until White's motion to reopen on the following Monday, the only action taken by the court was a discussion among the parties and the justice about the justice's jury instructions. Closing arguments, the instructions, and jury deliberations all lay in the future. Sole reliance on the passage of the weekend, without any showing whatever of prejudice to the State, as a ground for refusing White's motion must constitute an abuse of discretion. *See generally* 6 *Wigmore on Evidence* §§ 1877–80 (Chadbourn rev. 1976) (discussing different standards for reopening as trial progresses through final stages).

Although the presiding justice erred in denying White's motion to reopen the evidence, we must disregard as harmless any error which does not affect White's "substantial rights." M.R.Crim.P. 52(a). Here, because we find it highly probable that the presiding justice's error did not affect the judgment, we conclude that the error was harmless. *See State v. True,* 438 A.2d 460, 467 (Me.1981); R. Traynor, *The Riddle of Harmless Error* 35, 49–51 (1970).

According to White's offer of proof following his motion to reopen, McKenna told a fellow prisoner "I never saw [White] do anything to the child, and I was mostly with the child myself." [6] Such evidence might be important if the identity of the person who caused the baby's fatal injuries was at issue, or if there was a question of White's opportunity to have injured the child. In this case, however, White did not raise any such possibilities, despite having a full opportunity, before resting his case, to develop alternative defense theories.[7] Rather, his defense focused almost entirely on whether his conduct was intentional, knowing, or manifested depraved indifference. In closing argument, for example, White's counsel summarized the case as follows:

In my opening statement, I said to you this was a case of child abuse, and I don't intend to minimize or condone that aspect of this case. But the issue, Ladies and Gentlemen, before you, and this is what I set out at the beginning, is Francis White guilty of the crime of murder. Has the State carried its burden to prove to you beyond a reasonable doubt that Francis White intended to kill his child, or knew that his conduct would kill his child, or what the State has now emphasized, did he act with depraved indifference. I think he did not, and I think the evidence shows that.

. . . .

We have here that there were three or four [shaking] incidents. Now, let me

6. These statements are paraphrases of remarks attributed to McKenna by a fellow inmate during an interview with a State Police officer. The record, however, nowhere indicates whether the complete interview was before the presiding justice. The docket sheet lists the complete interview, labelled "Defendant's Exhibit 11," as having been submitted as an offer of proof on Friday, October 2, 1981. White, however, did not move to reopen the case until Monday, October 5. The interview does not appear in the record until April 25, 1982, when a different Superior Court justice granted White's motion to supplement his record on appeal by including his "Exhibit 11."

Even if we were to assume, for the sake of this appeal, that the entire interview was before the presiding justice, his denial of White's motion to reopen would still constitute harmless error, as the statements not included in White's oral offer of proof all tend to inculpate White. The interview attributes such observations to McKenna as: "on the night [the baby] was taken to the hospital, [White] was in the bathroom, possibly trying to revive the baby; [White] was very jealous of McKenna's attentions; McKenna didn't like to leve the baby alone; it apparently bothered White when the baby cried; and White apparently had a bad temper and once "blew up at [McKenna's nephew] and may have hit him."

7. White can claim no prejudice from the presiding justice's failure to rule promptly on McKenna's motion for judgment of acquittal at the close of the State's case-in-chief. Even assuming that White had a right to object to a ruling on McKenna's motion, neither party raised any timely objections and we do not find that the justice's delayed ruling constituted manifest error. M.R.Crim.P. 52(a); *see State v. Daley,* 440 A.2d 1053, 1055 (Me.1982).

suggest to you, Ladies and Gentlemen, that this did happen that way—that out of frustration, that out of ignorance, that this man shook this child. And maybe he shook it hard to cause these injuries—he grabbed it by the chest.

But how many of you, before you came here, knew the dangers of shaking a child? How many of you knew that it could have the repercussions that it had in this type of case?

Although the testimony presented in White's oral offer of proof is, in the abstract, exculpatory, we must review it in the context of the trial record. After considering all the evidence produced at trial, we are convinced that the proffered evidence was not at all probative on the central issue in the case: the nature of White's conduct, not his opportunity to have injured the child.

We also find that the evidence contained in White's offer of proof does not, alone, create a sufficient doubt as to whether a jury might have concluded that White was not responsible for the baby's death. White suggests that, had he been permitted to put McKenna on the stand, he might have gathered more evidence to support a "whodunit" case. White did, however, present an offer of proof regarding McKenna's expected testimony. We therefore refuse to indulge in speculation about what else she might have testified to. Because we conclude that it is highly probable that McKenna's testimony would not have resulted in a judgment of acquittal for White, we find the presiding justice's error in not reopening the evidence to be harmless.

## VI. *Prosecutorial Tactics*

■ At several points during the trial, White objected to remarks made by the prosecutor. He now contends that each of these incidents requires that we reverse his conviction.

First, during the voir dire of prospective jurors, the prosecutor asked two of them who indicated that they had a transportation problem whether, "[i]f you were chosen as a juror and we were able to provide some kind of transportation for you back and forth to the courthouse, would that take care of the problem for you?" White moved to exclude for cause those jurors who heard the prosecutor's questions. After the presiding justice denied the motion, White and his co-defendant McKenna exercised twelve of their peremptory challenges on those jurors.

During trial, the prosecutor referred to the baby as "little guy" and "little baby". When she referred to the "little guy" again, White objected. The presiding justice cautioned the prosecutor against use of the phrase but did not give the jury any curative instructions. The prosecutor thereafter refrained from further use of either term.

Finally, during her summation, the prosecutor apologized to two jurors by name for possible rudeness to them during trial that she claimed was necessitated by her duty to remain impartial. White's motions for curative instructions or a mistrial were both denied.

As we have previously pointed out, the prosecutor has a duty "to see that the accused has a fair trial [as well as the duty] to bring about a just conviction of the guilty." *State v. Reilly*, 446 A.2d 1125, 1128 (Me. 1982) (quoting *State v. Wyman*, 270 A.2d 460, 463 (Me.1970)). Although we do not condone the prosecutor's tactics in this case, however, we do not find that her remarks were of such a nature as to unduly influence the jury. We therefore conclude that the presiding justice did not err in overruling White's objections.

## VII. *Other Issues*

■ Our review of the record convinces us that other issues raised by the defendant on appeal, including the sufficiency of the evidence, are without merit.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C.J., and GODFREY and WATHEN, JJ., concur.

CARTER, Justice, with whom ROBERTS, Justice, joins, dissenting.

I cannot agree that the court's dual error in (1) failing to rule promptly on McKenna's motion for a judgment of acquittal at the close of the State's case-in-chief, 460 A.2d 1023 and (2) denying White's motion to reopen to call McKenna in order to attempt to prove her statement allegedly made prior to the trial that she "never saw Francis [the defendant] do anything to the child, and I was mostly with the child myself" was "harmless error." 460 A.2d 1022–1025. The effect of these errors coalesced to deny improperly the defendant the opportunity to produce evidence that was, for all that the record shows, the only available evidence that casts doubt as to whether the defendant committed the acts causing the baby's injuries. Because the opportunity to produce that evidence was denied, that issue was not generated. It is, consequently, illogical and unfair to say that the necessitous strategy of defense counsel in summation in doing the best he could with the resulting state of the record negated the obvious harm of the defendant's erroneous deprivation of the opportunity to generate and to argue the issue of whether the defendant performed the acts injuring the baby.

Counsel was lawfully entitled to have two arrows in his quiver at argument. The fact that he missed the mark with the only arrow that he was permitted by the court does not provide, in my mind, any assurance that he would not have struck the mark if he had been permitted to loose the second shaft. I cannot bring myself to believe "it *highly* probable" that the exclusion of McKenna's testimony "did not affect the judgment." *State v. True*, 438 A.2d 460, 467 (Me.1981) (quoting R. Traynor, *The Riddle of Harmless Error* 35, 49–51 (1970)) (emphasis added).

I would vacate the judgment and remand this case for a new trial.