THE STATE OF NEVADA, APPELLANT, *v.* RUSSELL BYRON BILLINGS, RESPONDENT.

No. 5334

January 16, 1968                    436 P.2d 212

*Harvey Dickerson,* Attorney General, of Carson City, and *Dennis E. Evans,* District Attorney, Churchill County, for Appellant.

*Martillaro and Bucchianeri,* of Carson City, for Respondent.

## OPINION

By the Court, THOMPSON, C. J.:

The State appeals from an order of the district court granting the petition of Russell Byron Billings for a writ of habeas corpus. Billings was charged with the murder of his wife. After a preliminary hearing the Justice of the Peace ordered that he be held to answer in the district court. The petition for habeas thereafter filed challenged the sufficiency of the evidence to hold him for trial. In honoring that challenge the district court expressed its view that the doctrine of Miranda v. Arizona, 384 U.S. 436 (1966), rendered inadmissible most of the significant testimony received at the preliminary hearing, and that

there was not enough other evidence produced to warrant holding the accused for trial. At all hearings Billings was represented by retained counsel. Since we do not agree with the district court's interpretation of Miranda, we reverse the order granting habeas and direct that Billings be held to answer in the district court.

Ailene Brown, radio dispatcher of the Fallon Police Department, received a telephone call in the police department office at approximately 4 p.m. on the afternoon of September 30, 1966. Testifying to the substance of that call,

"The voice asked if Pritch or any of the officers were in the office. And I said, 'No, not right now, but I can get one for you.' He said, 'Would you send them to 655 So. Russell?' And I said, 'What's the trouble?' And he said, 'I just killed my wife.' * * * I said, 'Who's calling, please?' and he said, 'Russell Billings.' And I said, 'I'll send them right down.' "[1]

Rousing Fallon Police Chief Mills and Officer Love from the Fallon Nugget, she relayed the message, and the two policemen proceeded to the South Russell address. Upon their arrival, several things happened almost simultaneously, or at least within the space of a few seconds: As the officers reached the top of the outside steps leading to the front door, before they could knock or ring, Billings opened the door, Chief Mills asked "What's the trouble, Russ?", Billings pointed to a body on the kitchen floor with the statement "There she is," and to a rifle lying on a couch in the living room with the statement "And that's what did it." He continued, in explanation, that he had accused her of "chippying around" on him, she had laughed at him, and so he had shot her. According to Mills' testimony,

"It was all part of a general conversation. I mean, he indicated the body, he indicated the weapon, 'I accused her of chippying on me, she laughed at me so I shot her.' * * * It was just—well, almost like one single sentence."

In the course of the next twenty minutes or so, before Billings was taken to the police station and booked, he continued in a more or less uninterrupted fashion to repeat statements such as he had made at the door, coupled with "I hope the children are ok, I hope they didn't see it, I shouldn't have done it, she laughed at me," etc. Chief Mills testified to all statements made from the time of the officers' arrival until Billings

---

[1]The witness also testified that she could identify the voice on the other end of the line as that of Billings since she had previously spoken with him face to face. Cf. King v. State, 80 Nev. 269, 392 P.2d 310 (1964), where we held that the identity of the party on the other end of the line may satisfactorily be shown by circumstantial evidence.

was removed from the premises. Billings was placed under arrest, and at approximately 4:30 p.m. was taken to the police station, booked, and locked in a cell.

As Billings was locked in the cell, Officer Case warned him as follows: "I said, I told him he had a right to legal counsel and the right to legal counsel immediately. He stopped me then, he said 'I know what my rights are, you don't have to tell me.' So then I says, 'No, we've got to tell you this.' I said, 'Anything you say may be held against you, and you do not have to say anything.' "

After that warning, Billings continued to talk. He said, "Do not let the children in the house to see what I have done, because they will hate me for the rest of my life. * * * Whatever you do keep the children out of the house. I don't care what happens to me because I'll probably burn. * * * If she hadn't laughed at me, I don't think I would have done it."

Two questions were asked of Billings at the police station: What was the address of the deceased's parents, and would he submit to a blood test.

We have related the essence of the incriminating statements of the accused, and the circumstances under which they were uttered. It is to be noted that the Miranda warnings were not given at any time, although an effort to comply was made when Billings was locked in his cell at the police station. Timely objection was made to such evidence at the preliminary hearing. The district court upon review of the transcript of that hearing ruled that all such evidence was precluded by the Miranda doctrine. We think that all of it is admissible and that the officers could listen to Billings talk without observing the procedural safeguards announced in that case.

The underlying theme of Miranda is that police interrogation is inherently compulsive since it normally occurs in a room cut off from the outside world, is usually secret, private and persistent, and is frequently accompanied by deception. As such, it carries a tendency to violate the Fifth Amendment privilege against self incrimination. To effectively secure that privilege procedural safeguards are established. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates

in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." 384 U.S. at 444, 445.45.

The court concludes: "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 479.

In the case at hand the telephone call and the statements of Billings at his home and at the station were not given in response to police interrogation within the intendment of Miranda. The statements were volunteered, and were voluntarily and openly made in an atmosphere free from official compulsion or inducement of the kind invisioned by Miranda, and cannot sensibly be said to have been obtained "as a result of interrogation." During the entire time that Billings was present with police officers in his house the single question asked was the initial "What's the trouble, Russ?", made in response to a request from Billings himself that the officers come to his home. The statements which followed are, we think, specifically excluded under the following Miranda language: "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478. See also: Davidson v. United States, 371 F.2d 994 (10 Cir. 1966), where, although the warnings had been given, the court based its ruling of admissibility on the fact that the statements were voluntary and volunteered without solicitation or interrogation by the officers.

The utterances of Billings in his cell at the police station fall within the same rationale. They were simply not the result of police interrogation [State v. Hill, 422 P.2d 675, 676 (Ore. 1967)], and were volunteered and voluntary.

One additional issue is mentioned. The corpus delicti of the crime must be established independently of any confessions or admissions of the accused. Ervin v. Leypoldt, 76 Nev. 297, 301, 352 P.2d 718 (1960); Sefton v. State, 72 Nev. 106, 295

P.2d 385 (1956); State v. Fouquette, 67 Nev. 505, 221 P.2d 404 (1950). Of course, the corpus delicti of the crime is the fact of death and the criminal agency of another causing death. The fact of death is not disputed; the causal connection of the criminal agency is, since, according to the accused, the mortician who examined the body at the Billings residence was not competent to give his opinion that death resulted from a gunshot wound. An autopsy was not performed.

The mortician was a competent witness. He had examined over two hundred bodies that had been inflicted with gunshot wounds. He observed the decedent's gunshot wound in the chest. The weapon itself was found lying on the couch in another room thus suggesting the improbability of suicide. This showing was sufficient. Morton v. State, 82 Nev. 223, 414 P.2d 952 (1966). The identity of the perpetrator of the homicide is not an element of the corpus delicti. Ervin v. Leypoldt, supra.

Reversed and remanded for further proceedings.

COLLINS, ZENOFF, BATJER, and MOWBRAY, JJ., concur.