## NATHANIEL ELWOOD BROWN *v.* STATE OF MARYLAND

[No. 243, September Term, 1967.]

*Decided June 4, 1968.*

The cause was argued before MURPHY, C. J., and ANDER-
SON, MORTON, ORTH and THOMPSON, JJ.

*Frank Cannizzaro, Jr.,* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Charles E.
Moylan, Jr., State's Attorney for Baltimore City,* and *I. Elliott*

*Goldberg, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

PER CURIAM.

On May 25, 1967, the appellant, Nathaniel Ellwood Brown, was convicted of murder in the second degree in the Criminal Court of Baltimore by Judge James A. Perrott, sitting without a jury. On June 6, 1967, appellant's Motion for a New Trial was denied and he was sentenced to thirty years imprisonment under the jurisdiction of the Department of Correction.

Appellant raises three contentions on appeal.

1. That his oral statements were inadmissible in view of *Miranda.*
2. That the lower court erred in not accepting the defense of self-defense.
3. That the evidence was insufficient to sustain the conviction.

From the evidence adduced at the trial the court could properly find that Daniel Clay was shot to death by the appellant on September 12, 1966, in front of 1413 Pennsylvania Avenue, Baltimore, Maryland.

An autopsy report, submitted into evidence by stipulation, established that the deceased, Daniel Clay, age 23 years, Negro male, 6' 9" tall, weight 157 lbs., died as the result of multiple gunshot wounds of the chest, causing a massive internal hemorrhage.

The State's first witness was Officer Carl Johnson who testified that upon receiving certain information regarding a shooting, he investigated and found the deceased lying on the sidewalk, with his head and shoulders leaning against the building at the above address, and that no weapon was observed upon the deceased nor within the vicinity of his body. He further testified that he called an ambulance and was unable to ascertain the identity of the assailant.

The State's second witness was Joyce Worley who testified that she and Annie Williams were in the vicinity of the shooting when they heard a shot. As they ran to the scene, they bumped into the appellant, whom they knew well and positively

identified, and were informed by him that he had shot her cousin, the deceased.

The State's next witness was Annie Williams whose testimony fully substantiated the aforenoted testimony of Joyce Worley.

The State's next witness was the deceased's mother, Laura Clay, who testified that on the date in question, the appellant came to her house seeking out the deceased for the expressed purpose of apologizing to him for an argument they had the previous night. After waiting a short while, he left.

The State's final witness was Detective William Schneeman who testified that while sitting in his office on September 14, 1966, at about 9:10 p.m., the appellant came to his office door and stated, "I'm Fish. You are looking for me." He further stated to the effect, "I shot and killed that man." Detective Schneeman responded, "What?" and invited the appellant inside. The appellant continued his explanatory statement, without interruption, "I want to tell you about it. My mother told me come in and get it squared away." Appellant then entered and sat down and was informed that the officers would like to go over the statement again, "get it written down, advise you of your rights, and get a written statement." Appellant was then informed of his *Miranda* rights, excepting the warning that anything he said could and would be used against him in a court of law.

After reviewing the question of voluntariness, the trial court excluded the written statement, while admitting the oral statement.

Appellant, testifying in his own defense, stated that he was 29 years old, 5' 7" tall, weighing 106 lbs., and admitted shooting the deceased, but urged the court to find that he had acted in self-defense. As background to the shooting, the appellant testified that he owed the deceased $85.00 for some drug purchases, plus an additional amount for some drugs he had agreed to sell for the deceased but had converted the drugs to his own use instead. It was over this owed money that the prior argument arose and the deceased knocked the appellant to the ground and kicked him. It was allegedly to repair the friendship from this altercation that the current confrontation arose. After the

appellant admitted that he was in the wrong and told the deceased that he had spent the money which he previously had for him, the deceased stated, "I'm tired of this" and reached for his back pocket while asking, "Where's my money?". Deceased then, according to the appellant, "hit me on my shoulder, knocked me down, went to kick me, going in his back pocket. Before I know it, I come out with the gun, shooting, getting away from him. He was still coming. I kept on shooting." The gun was allegedly given to the appellant to sell earlier in the evening and he just happened to be carrying it at the time of the attack.

Appellant's testimony regarding the circumstances surrounding the oral statement, was diametrically opposed to that of Detective Schneeman. Appellant contends that upon entering the police station, he approached an officer and stated, "I'm inquiring about a murder I've been accused of." Thereupon, another officer was summoned and he began questioning the appellant and invited him into an office. Appellant urges that he initially refused to give a statement because he was "under the influence of narcotics and I would rather see a lawyer before I give a statement or anything." He stated that thereafter the officer continued to urge him to give a statement, since he said he didn't do it, and that thereafter, due to his groggy condition and the officer's persistence, he finally gave in and made the desired statement.

Detective Schneeman testified again on redirect. After reviewing the contradictory testimony addressed to the circumstances surrounding the oral statement, the trial judge, in performing his duty of judging the credibility of the witnesses, found that Detective Schneeman's version was the credible one. *McRae v. State,* 3 Md. App. 388, 393, 239 A. 2d 607, 610 (1968).

Appellant's first contention urges that the oral statement was inadmissible owing to the failure of the police to interrupt the appellant after the initial statement, "I'm Fish, I shot that man," and fully advise him of the warnings enunciated in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

It is well settled that under *Miranda* volunteered statements or "blurts" are admissible. *Carrington v. State,* 1 Md. App. 353,

357, 230 A. 2d 112, 114 (1967) citing *Campbell v. State,* 244 Md. 363, 366, 223 A..2d 604, 606-607 (1966) ; *Carwell v. State,* 2 Md. App. 45, 50, 232 A. 2d 903, 906 (1967).

We think it clear that the oral statement was not obtained by a "custodial interrogation." In discussing the procedural safeguards set forth in *Miranda,* we stated in *Carwell v. State, supra,* at page 50:

> "We held in *Gaudio and Bucci v. State,* 1 Md. App. 455 that those safeguards applied to statements made during a 'custodial interrogation' and that *Miranda* did not protect an accused 'under any and all circumstances * * * to the extent that no inquiry at all by the authorities is permissible without prior warning.' In the instant case there was not even an inquiry by the police; the appellant simply 'blurted out' the statement to which objection was made."

The *Miranda* mandate directs absolute compliance with the prerequisite minimal standards set forth therein where the appellant is being subjected to custodial interrogation. *Tillery v. State,* 3 Md. App. 142, 147, 238 A. 2d 125, 128 (1968). However, this protective shield addresses itself to the "custodial interrogation" of the accused and is not so all persuasive as to compel the police officers to interrupt the spontaniety and continuity of volunteered statements. As was stated in *Miranda, supra,* at page 478:

> "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding. today."

Here, it affirmatively appears from the record that the appellant voluntarily presented himself at the Baltimore City Police Department's Homicide Division and, prior to his being

placed in custody, and before he could be advised of his constitutional rights embodied in *Miranda,* gave the oral statement which was introduced at trial. Based upon the totality of circumstances surrounding the procurement of the statement, we are of the opinion that appellant's spontaneous utterance, upon voluntarily presenting himself in conjunction with the absence of interrogation, is clearly within the realm of the permissible "volunteered statements" alluded to in *Miranda.* See *Parsons v. United States,* 387 F. 2d 944 (10th Cir. 1968).

Appellant's second and third contentions are totally devoid of merit.

That the appellant committed a homicide is beyond question. The medical report, admitted into evidence by stipulation, established that Daniel Clay had died at 7:55 p.m. on September 12, 1966, as the direct result of multiple gunshot wounds to the chest. Witnesses Joyce Worley and Annie Williams both testified that the appellant informed them, immediately after the shooting, that he had shot the deceased. Furthermore, upon surrendering himself to the police, the appellant voluntarily admitted shooting the deceased. Finally, the appellant elected to testify and admitted having shot the deceased, while urging that he was acting in self-defense.

It is well settled that the law presumes, in the absence of justification, excuse or some circumstance of mitigation, that all homicides are committed with malice and constitute murder. *Williams v. State,* 2 Md. App. 170, 176, 234 A. 2d 260, 263-264 (1967). Thereafter, the burden is upon the accused to prove that he acted in self-defense. *Davis v. State,* 237 Md. 97, 103, 205 A. 2d 254, 258 (1964).

As was stated in *Davis v. State, supra,* 104:

> "An actual intent to take life is not necessary for a conviction of murder if the intent is to commit grievious bodily harm and death occurred in consequence of the attack."

That Court also stated at page 103:

> "The burden is upon the State to prove an unlawful killing, but the burden of proof of self-defense is up-

on the defendant. *Perry v. State,* 234 Md. 48, 197 A. 2d 833 (1964); *Davis v. State,* 204 Md. 44, 102 A. 2d 816 (1954)."

As was stated in *Tipton v. State,* 1 Md. App. 556, 232 A. 2d 289, 291 (1967) at page 560:

> "In order to justify an assault on the basis of self-defense, the accused must have had reasonable grounds to believe, and have in fact believed himself to be in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant. The trier of facts must determine whether the accused was justified in meeting force with force. If justification is found to have existed, the force used against the assailant must not have been unreasonable or excessive, i.e., the defender must not have used more force than the exigency reasonably demanded."

And in *Ware v. State,* 3 Md. App. 62, 237 A. 2d 526, 528 (1968), we again noted that:

> "The law is clear that although a person may defend himself, even to the extent of taking life to repel the attack of an aggressor, it is equally well settled that he cannot use more force than is necessary."

See also *Gray v. State,* 4 Md. App. 175, 180, 241 A. 2d 909, 912 (1968).

The trial court found that the appellant's act constituted unjustified, unreasonable, and excessive force under the instant circumstances and therefore did not constitute self-defense.

The applicable test in reaching a determination of the sufficiency of the evidence in a non-jury case is whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Speaks v. State,* 3 Md. App. 371, 379, 239 A. 2d 600, 605 (1968); *Anderson v. State,* 3 Md. App. 362, 369, 239 A. 2d 579, 583 (1968); *Montague v. State,* 3 Md. App. 66, 72, 237 A. 2d 816, 820 (1968).

In non-jury trials the weight of the evidence and the credibility of the witnesses rests within the determination of the trial

judge. *McRae v. State, supra,* 393; *Anderson v. State, supra,* 369; *Lucas v. State,* 2 Md. App. 590, 592, 235 A. 2d 780, 781 (1967). Furthermore, in non-jury trials, the trial court in performing its duty of judging the credibility of witnesses may disbelieve the exculpatory statements made by the defendant. *Anderson v. State, supra,* 369.

From the facts of this case the trial court could have found adequate evidence for a conviction of second degree murder. See *Smith v. State,* 240 Md. 464, 481, 214 A. 2d 563 (1965); *Davis v. State, supra,* 104; *Tate v. State,* 236 Md. 312, 317, 203 A. 2d 882 (1964); *Trout v. State,* 3 Md. App. 259, 238 A. 2d 281 (1968); *West v. State,* 3 Md. App. 123, 238 A. 2d 292 (1968); *Williams v. State, supra.*

This Court cannot reverse a judgment of the lower court unless it is shown that there was no legally sufficient evidence, or proper inferences therefrom, from which that court could find the accused guilty beyond a reasonable doubt. *Anderson v. State, supra,* 371. Such prerequisite showing was not established in this case and we cannot say that the judgment of the lower court was clearly erroneous. Maryland Rule 1086; *Speaks v. State, supra,* 379; *Anderson v. State, supra,* 371; *Lucas v. State, supra,* 593.

*Judgment affirmed.*