**STATE of Maine**

v.

**Roy Lee TAYLOR.**

Supreme Judicial Court of Maine.

July 29, 1975.

Charles K. Leadbetter, John Atwood, Asst. Attys. Gen., Augusta, for plaintiff.

Alan C. Sherman, Waterville, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

ARCHIBALD, Justice

The body of a sixty-two year old owner of a motel in Clinton, George Harold Henderson, was discovered at approximately 1:00 p. m. on January 19, 1973, in the motel office. Subsequent medical examination by a qualified pathologist proved beyond doubt that Mr. Henderson "died of loss of blood due to multiple stab wounds," which were "inconsistent with life for more than a matter of two or three minutes."

Roy Lee Taylor, age twenty-four, was ultimately arrested, indicted for this homicide, tried before a jury and convicted of murder. He has appealed from that conviction.

We deny the appeal.

Appellant filed a statement of fourteen points on which he intended to rely in prosecuting his appeal. Rule 39(d), M.R. Crim.P. In his brief he has waived the final point, thus leaving thirteen for our consideration.

## FACTUAL BACKGROUND

A few days prior to January 17, 1973, appellant and a friend, Charles Lee Mitchell, known as "Bucky," both residents of Charleston, West Virginia, left there, planning on driving to Bangor, Maine, to visit with friends of Taylor. Shortly before arriving at the Clinton Exit on Interstate 95, the car "broke down." Taylor and Mitchell then obtained a ride into Clinton, were taken to the Henderson Motel where they engaged a room and stayed overnight.

The next day it was determined that the automobile was beyond repair and Taylor sold it for $50.00. Taylor and Mitchell then travelled by bus to Bangor where they remained for three nights in a motel. Taylor registered at this motel, as he had in the Henderson Motel, under a fictitious name.

On January 16 the couple proceeded southerly from Bangor and spent that night in a deserted house, the next morning returning to Clinton, one purpose being to recover certain luggage which they had left in the Henderson Motel. Having arrived in Clinton, they were seen in a diner in the vicinity of 10:00 a. m. The operator of the diner and his wife agreed that they were there "on and off" until after 6:00 p. m., the excuse for so remaining in Clinton being that "[Taylor's] car had been broke down on 95" and "[Taylor] was waiting for repairs down at the Sunoco station."

Witnesses who had observed appellant testified to facts from which his conduct could be described as furtive. It was also observed that he was wearing "a knife strapped on his side," which was characterized as a hunting knife.

In the evening of January 17 a fourteen year old boy was skating in an area adjacent to the Henderson Motel. This boy was familiar with Mr. Henderson's automobile and he testified that at 6:45 p. m. he observed this automobile leaving the motel yard, going "fast." His attention was focused on this episode because, to his knowledge, Mr. Henderson usually drove slowly.

There was no further evidence of activity in the area of the Henderson Motel until approximately 1:00 p. m. on January 19 when a witness had occasion to enter the motel office and there discovered Mr. Henderson's inert body. Other witnesses made observations of the office and the body, police were notified and an orderly investigation ensued, which resulted in the appellant's arrest in West Virginia.

On January 18 a truck driver observed a knife on the ground "about a mile" from the Clinton interchange of Interstate 95. He recovered it and turned it over to the Maine State Police. This knife (State's Exhibit 17) was identified by "Bucky" Mitchell as belonging to appellant and, according to Mitchell, was the murder weapon. Because one stab wound in particular had penetrated the sternum, the pathologist was able to formulate some opinion as to the size of the knife and the length of the blade. He testified, "I believe that that instrument [Exhibit 17] could have produced the wounds that I described in my finding of Mr. Henderson."

There was conflicting testimony dealing with the responsibility for this homicide. Mitchell, admitting that initially it was his idea to rob Mr. Henderson and "to stab the guy," testified that he "backed out" and that the killing was actually done by the appellant. He related facts indicating their return to Clinton from Bangor, their presence in the diner for several hours, and their initial return to the motel where he lost the courage to consummate their plan. However, the appellant's actions on

their subsequent return to the motel office were described by Mitchell as follows:

"Q   Who went back to the motel?

A   Me and Mr. Taylor.

Q   What happened there at the motel office?

A   Which time?

Q   The second time when you returned?

A   He said that he was going to do it. He knocked on the door and the guy stood up and motioned for us to come in. We walked in and he told the guy to sit down.

Q   Who told the guy to sit down?

A   Mr. Taylor.

Q   Then what happened?

A   The guy says why and he stabbed him.

.   .   .   .   .   .

Q   Did you stab Mr. Henderson?

A   No.                              .

Q   What did Mr. Henderson do after he was stabbed?

A   He just laid on the floor.

.   .   .   .   .   .

Q   What did Mr. Taylor do after he was on the floor?

A   Went over him.

Q   Would you explain what you mean?

A   Went over and stabbed him again.

.   .   .   .   .   .

Q   After Mr. Taylor stabbed Mr. Henderson, what happened next?

.   .   .   .   .   .

A   He searched him, got the keys to his car and from there we went to park the car at a motel and from there to a bus station."

Subsequent to the arrest in West Virginia, appellant was interrogated by a detective of the Charleston Police Department who took a signed statement. In essence, Taylor stated that while en route from Bangor to Clinton he and Mitchell decided to rob Mr. Henderson but, on their first visit to the motel office, "Bucky chickened out." On their later return, still for the purpose of robbery, Taylor claimed that the initial stabbing was done by Mitchell but when Mr. Henderson resisted he, Taylor, knocked him to the floor by hitting him under the ribs. The robbery was then consummated, following which they took the Henderson automobile, drove it to Portland, there abandoned it, and took a bus to Charleston.

On January 25 a detective of the Maine State Police was in the process of returning appellant to Maine by automobile. During this trip the detective interrogated Taylor further and he repeated this conversation in the presence of the jury. Essentially, it was in agreement with the prior written statement but it elaborated on the precise activities of both Taylor and Mitchell in the commission of the homicide. We incorporate herein that testimony:

"The outside door to the motel office was closed but the inside one was open. They could see Mr. Henderson at this time, lying on the bed watching TV. They knocked on the door of the office. Mr. Henderson got up, came to the door and they went in. Mr. Taylor advised that he went directly over to where his luggage was and bent down to pick it up. At this time, this left the opportunity when Mr. Henderson turned his back on Bucky, that Bucky had a knife in his hand and he got the drop on Mr. Henderson. Mr. Taylor advised that Bucky told Mr. Henderson to sit down in a chair. Mr. Henderson turned around and asked Bucky, 'What did you say?', and Mr. Taylor said that Bucky advised him again, sit down in the chair. At

**16**

this point, Mr. Taylor advised that Mr. Henderson made a grab for Bucky and when he did Bucky stabbed him twice. Then Mr. Taylor advised that he had his knife in his left hand and when he saw that Mr. Henderson was still standing, he went over and stabbed him a couple of times. Then they searched Mr. Henderson's personal clothing on him for the car keys and they couldn't find them. Finally, the keys were located on the little refrigerator which had the television sitting on top of it. Mr. Taylor advised that Bucky had taken the two wallets which contained approximately, between $86 and $91 and also a small coin box which had between $7 and $8 in change in it. Mr. Taylor stated that he told Bucky to go outside and start the car and that Bucky did go outside and start the car and Mr. Taylor went out and got into the car on the driver's side and drove the car away . . . ."

While incarcerated in the Kennebec County Jail pending trial the appellant acknowledged to a deputy sheriff assigned to supervise him during an exercise period that he personally had stabbed and killed Mr. Henderson.

The State then rested and the appellant first called his brother, whose testimony concerned itself with his knowledge of "Bucky" Mitchell. He described him as physically competent and skillful at the operation of a motor vehicle, even though he had no driver's license. He testified that it was Mitchell's custom to carry a hunting knife "taped to his leg," and also that he usually carried a pocket jackknife.

The next defense witness was one Hubert O'Connor, appellant's uncle. He was present at the Charleston Police Station while Taylor was being interrogated but was not in the same room during the actual interrogation, which was in the vicinity of 11:00 p. m. Although he testified, "I was drunk," when he left the police station at 2:30 a. m., he did say that the police officer had told Taylor "that the best thing

would be just tell the truth and that he would help him as much as he could." O'Connor was also acquainted with Mitchell and testified that "[h]e usually carried a knife" and "he sometimes had it taped to leg and other times he carried it on his person."

The defendant elected to be a witness. As we read the record, he did not dispute the testimony elicited from either the police officer in Charleston or the detective from the Maine State Police. However, his own version of the actual killing of Mr. Henderson varied radically from his statements given to these officers and the testimony given by Mitchell.

Defendant, before the jury, blamed Mitchell for originating the scheme to rob Mr. Henderson, but he denied any active participation in the commission of the crime and placed the entire responsibility on Mitchell. He testified that although he knew Mitchell was to commit the robbery, he waited for him in the diner, subsequently noticed him outside the diner, and testified: "He called me outside so I went on out and he was outside and he had this car with him"; and "[h]e [Mitchell] told me he had to stab the guy, he didn't say how many times."

Taylor then acknowledged that they had left together in the car and while travelling to Portland two knives had been thrown from the vehicle.

When asked why he signed the statement in Charleston, he said, "I was trying to cover up for Bucky and they said they would make it hard for my brother if I didn't sign it." Referring to the oral statement given the State Police detective, Taylor admitted that he readily answered "a whole bunch" of questions but that he did so "because like I said, at the moment, I already made a statement, there was nothing I could do."

Defendant categorically denied having had any conversation with the deputy sheriff in the jail exercise area. He was

asked, "Did you ever tell him anything?", and he answered, "No, sir," later testifying, "I never talked to Officer Cameron."

We will consider the points of appeal in the same sequence as that adopted by the appellant in his statement.

### Points 1 and 2

■ Several photographs of the interior of the motel office were offered and admitted in evidence, some of which depicted portions of the dead body. Additionally, there were colored slides made during the autopsy, two of which were admitted in evidence. Appellant argues that it was unnecessary to admit all the photographs showing the body of the deceased in the motel. He further argues that the colored slides made during autopsy served no useful purpose and that their probative value was outweighed by the danger of prejudice.

All of the photographs involved were accurate reflections of the objects portrayed and, although not necessarily vital to the comprehension of descriptive oral testimony, it cannot be doubted that these photographs aided the jury in its understanding of this testimony.

We cannot say that the Justice below, who viewed all of the photographs preliminarily to admitting them in evidence, abused his discretion. His ruling was entirely consistent with established precedent. *See State v. Berube,* 297 A.2d 884 (Me. 1972), and cases therein cited at page 888.

### Point 3

■ Without citation of authority it is contended that the testimony of the witness who observed the Henderson car leave the motel was "completely irrelevant" because he was unable to tell how many people were in the vehicle or who they were. We disagree.

Mitchell had testified that after the robbery had been committed he took possession of the Henderson car. He further testified that he did so at Taylor's request in order to facilitate their escape.

Additionally, both Taylor and Mitchell were last seen in the diner in the vicinity of 6:30 p. m., thus the testimony of the youthful witness tended not only to fix the time of the actual homicide but to make Mitchell's critically important testimony more probable than it might otherwise have been.

■ While evidence offered only to prove a merely collateral fact is not generally considered relevant, any evidence which tends to either add probability or improbability to material facts is relevant and should be admitted. *Perlin v. Rosen,* 131 Me. 481, 164 A. 625 (1933). Such is the case here.[1]

### Point 4

This point concerns an evidentiary ruling allowing Mitchell's answer to a particular question. The record reflects these two questions and answers:

"Q He [Taylor] asked you what?

A To stab the guy.

Q What did you say?

A I went along with him at first and when I seen he was serious . . . . "

■ The Justice below, considering "the circumstances of the age of the witness

---

1. Rule 401 of the Maine Rules of Evidence (effective February 2, 1976) defines Maine law on "relevant testimony" in traditional terms, namely:
   " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

and so forth," allowed the answer to stand over an objection that it was not responsive. Appellant has failed to brief this point and thus has waived it. *State v. King,* 330 A.2d 124 (Me.1974). However, having read Mitchell's entire testimony, it is clear that the answer was non-prejudicial.

### Point 5

State's Exhibit 17 was the hunting knife claimed by the State to be the murder weapon. Appellant contends that it was admitted in evidence without a proper foundation having been established.

Having seen this knife in Taylor's possession both in Bangor and Clinton and having discarded it at Taylor's request after the commission of the crime, Mitchell testified that he recognized it from the handle and that it belonged to Taylor.

Over objection the Court ruled:

"I'll admit it based upon the identification of this witness. Of course, the truthfulness of the identification is up to the jury but it is admitted under those circumstances."

■ Since the weight to be given this testimony was left to the jury, a ruling admitting the exhibit in evidence can be reversed only upon showing a failure of identification. *State v. Wardwell,* 158 Me. 307, 183 A.2d 896 (1962).[2]

The exhibit was properly admitted.

2. We note Rule 901(a), (b)(1) of the Maine Rules of Evidence:
"(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
(1) *Testimony of witness with knowledge.* Testimony of a witness with knowledge that a matter is what it is claimed to be."

### Point 6

Appellant moved to strike the entire testimony of Mitchell, claiming it to be "so unreliable and his answers so evasive" that it was totally lacking in probative value.

■ It is true that Mitchell responded, "I don't know" on numerous occasions. However, we have read his testimony in its entirety and note that many of these responses were to questions dealing with time, place and distance. The record shows (and, of course, the jury was aware of this) that the witness was only sixteen when the episode occurred, that he had never been in Maine before, and that he was testifying to occurrences which he witnessed some six months previously.

A rational jury properly instructed as to the weight to be given testimony (as was done here) certainly was able to determine whether this testimony was worthy of belief. We cannot say as a matter of law that it lacked credibility. *See State v. Brewer,* 325 A.2d 26 (Me.1974).

### Point 7

■ This point focuses on the admissibility of Taylor's statement [3] to the detective in Charleston, West Virginia. A preliminary hearing was held in the absence of the jury and the Justice below ruled that the statement "has met all the legal requirements of admissibility." At the suppression hearing the appellant elected to

3. Appellant was the ultimate beneficiary of an instruction more favorable than the law required since the jury was told that before it could give any consideration to the statements it must "find from the evidence beyond a reasonable doubt that the defendant made the statements constituting the alleged confessions of fact and that they were made by the defendant voluntarily and of his own free will and with a full and perfect knowledge of the nature and consequences of the said confessions of fact." *State v. Peabody,* 320 A.2d 242 (Me.1974).

testify in rebuttal, claiming an insufficiency in giving the Miranda warnings and that the statement was made under duress. A clean-cut fact issue emerged and we detect no error in admitting this statement. *State v. Collins*, 297 A.2d 620 (Me.1972).

*Point 8*

This point brings into focus the admissibility of the statement made to the deputy sheriff during the exercise period in the Kennebec County Jail. In admitting this statement the Justice premised his ruling on (1) the Miranda warnings had been previously given the appellant, and (2) "it was an absolutely voluntary statement which would have been admissible even without the Miranda warning."

For purposes of clarity we incorporate the testimony in this regard:

"Q Alright. Now, who spoke first when you got out in the exercise yard, yourself or Mr. Taylor?

A It was not in the exercise yard, exercise area of the cell block.

Q Who spoke first?

A Mr. Taylor did.

Q What·did Mr. Taylor·say to you?

A He said, can I refer to my notes again?

Q Yes, certainly.

A Some of the statements were, 'We never really intended to kill that guy at first. The car broke down and we just went in there.'

Q What did you say after that?

A At that time, I said, 'Well, what do you mean?', and he went on.

Q What did he say?

A He said, 'Well, Buffy got the drop on him with a knife and the guy leaped on Buffy. Buffy stabbed him twice then, I ended up with the knife and hell, I just had to kill him. He was already bleeding like a pig. He never should have jumped on old Buffy. He made me kill him and I did a good job too.'

Q What else did he say?

A He also stated, 'My lawyer won't let me plead guilty. I wish he would, I want to get up to Thomaston.'"

The above quoted testimony makes it evident that this conversation was initiated by the appellant and not by the deputy sheriff, who only asked the single question: "Well, what do you mean?"

Taylor's opening statement to the deputy sheriff did not result from any question, nor does the record indicate that Taylor was in any way induced to engage in this conversation. We can only conclude that his initial remark was completely voluntary and spontaneous, and not the product of either direct or subtle interrogation.

In *State v. Lafferty*, 309 A.2d 647 (Me. 1973), we were faced with nearly an identical factual situation when Lafferty made an inculpatory statement without being questioned, while under arrest and en route to the police station. We there held that

"spontaneous or voluntary statements *which are not the product of custodial interrogation* are admissible without prior Miranda warnings, even though made while under arrest."

*Id.* at 655. Thus, the initial statement made by Taylor was clearly admissible.

The next issue is whether a warning should have been given before the deputy responded, "Well, what do you mean?" We do not feel it necessary to discuss whether the two prior Miranda warnings given Taylor (first in Charleston, West Virginia, and secondly, en route to Maine) would be a sufficient basis on which to admit the remainder of appellant's state-

ment, bearing in mind that approximately one month had elapsed since these warnings were given. We view the question asked by the officer not in the context of police interrogation but as a neutral type of question naturally responsive to the appellant's own statement. The California Court, faced with a similar factual situation, held:

" '[T]he questioning was initiated by defendant, and the [defendant's] statement was volunteered in response to a neutral inquiry invited by defendant's own remarks; the conduct of the police was neither intimidating nor accusatory, nor did it appear in any way designed to elicit incriminatory statements . . . .' [Citation omitted.]"

*People v. Tomita*, 260 Cal.App.2d 88, 66 Cal.Rptr. 739, 741 (1968); *see also Campbell v. State*, 4 Md.App. 448, 243 A.2d 642 (1968); *Brown v. State*, 4 Md.App. 261, 242 A.2d 570 (1968).

### Point 9

■ Appellant challenges the admissibility of the statement he gave to the Maine State Police detective while en route to Maine. He concedes that the detective fully and properly advised him of his constitutional right to the advice of counsel but he argues that under the circumstances then existing the utilization of this right was illusory. He takes the position that since he was a passenger in an automobile travelling on the Pennsylvania turnpike, had he requested the services of counsel none could have been provided. The simple answer to this argument is that if he desired the advice of counsel before answering the detective's questions, it was completely within his power to remain silent until an opportunity to obtain counsel presented itself.

### Point 10

■ There is no merit in appellant's argument that it was error not to grant his

motions for acquittal made at the close of the State's case and renewed at the termination of the evidence. As we have tried to demonstrate by including a rather detailed factual background, the State's case contained facts from which a rational jury could find all of the requisite elements of murder. In defense the denial of responsibility for the homicidal act presented merely a conflict in the testimony and was properly left to the jury for its determination.

### Point 11

During the cross-examination of the defendant objection was made on the ground that the questions were argumentative. The purpose of the cross-examination was to test the accuracy of the defendant's testimony on direct examination having to do with the execution of the signed statement taken in West Virginia. The following are the questions, answers, and ruling on which this point is premised:

"Q Alright. Mr. Taylor, do you customarily sign important documents which you haven't read?

A Yes, sir.

Q You do?

A Once in a while.

Q Even those that confess to a murder?

MR. SHERMAN: Objection.

A I didn't know what the document was confessing to.

MR. SHERMAN: Object, your Honor, that's argumentative.

THE COURT: And I think the jury will recognize that, I'll let it stand."

■ If we assume that the last question was argumentative since the signed statement did not necessarily "confess to a murder," the ruling allowing the question to stand is within the discretionary power

of a presiding justice. Indeed, the appellant has been unable to point out in his brief that any prejudice flowed of that gravity which would necessitate a reversal of his conviction. On the contrary, the cross-examination could have been viewed as a probe into the unlikelihood that the appellant would sign a document knowing that the result would be to implicate him in this homicide.

This point is without merit.

### Point 12

Prior to argument appellant moved that arguments of both counsel be included in the record. The presiding Justice denied the request, stating:

"I'm going to deny it and the reason I'm going to deny it is the fact that a Court Reporter could be inaccurate in the delivery because of the fact that he cannot interrupt the arguments. Counsel, many times turn their backs on the Court Reporter and it could lead to such error that I don't believe it would be of any assistance at all to this Court or to the Law Court."

■■■ The Justice below, of course, was aware from his many years of experience with the problems of court reporters when required to report the oral arguments of counsel. He was likewise aware of the speech habits of the counsel involved, as well as the physical conditions of the courtroom in which the trial was being held. The probability of inaccurate reporting of the oral arguments was realistic. Since there is neither a rule of court nor a

statute which requires the inclusion in the record of arguments to the jury, nor has it been the usual practice in this State to do so, the issue raised by the motion was one falling within the discretionary powers of the presiding Justice. *Bennett v. State*, 161 Me. 489, 214 A.2d 667 (1965). Nothing has been demonstrated to us indicating any abuse of that power.

If the argument of counsel was of such a prejudicial nature that a mistrial should have been ordered, appellant is not powerless to bring that issue before us. Rule 74(n), M.R.C.P.,[4] provides a method for preparing a record where no stenographic report was made. Appellant did not utilize this procedure.

This point is without merit.

### Pont 13

■■■ Finally, after the arguments were completed appellant moved for a mistrial on the sole ground that counsel for the State characterized the appellant as a person with "a maligned heart and a malicious mind," premising his motion on the theory that this language was intended to inflame the jury. We have no knowledge of the context in which these expressions were used, the appellant not having utilized Rule 74(n) *supra*. We cannot be expected to decide this issue on a silent record. *See Patterson v. Rossignol*, 245 A.2d 852 (Me. 1968). Mere unexplained excerpts from the remarks of counsel in argument taken in isolation are insufficient on which to predicate a claim of error. *Cody v. State*, 376 P.2d 625 (Okl.Cr.1962).

4. "(n) Appeals When No Stenographic Report Was Made. In the event no stenographic report of the evidence or proceedings at a hearing or trial was made, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection, for use instead of a stenographic transcript. This statement shall be served on the appellee who may serve objections or propose amendments thereto within 10 days after service upon him. Thereupon the statement, with the objections or proposed amendments, shall be submitted to the court for settlement and approval and as settled and approved shall be included in the record on appeal."

In summary, our analysis of the record in its entirety indicates that the appellant was ably defended and his trial was conducted with scrupulous respect for his basic rights. Accepting the State's version of the facts, the evidence thus adduced pointed overwhelmingly in only one direction, namely, that of the guilt of the defendant.

The entry is:

Appeal denied.

All Justices concurring.