**STATE of Maine**

v.

**Albert L. SIMONEAU.**

Supreme Judicial Court of Maine.

June 29, 1979.

Michael D. Seitzinger, (orally), Charles K. Leadbetter, Fernand R. LaRochelle, Asst. Attys. Gen., Augusta, for plaintiff.

LaFountain & Ordway by David R. Ordway, (orally), Lloyd P. LaFountain, Biddeford, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

POMEROY, Justice.

Defendant appeals from four judgments of conviction entered on a multi-count indictment charging murder, aggravated assault, and two counts of attempted murder. 17–A M.R.S.A. §§ 201, 208, 152.

We deny the appeals.

## I.

The facts are not in dispute.

On April 1, 1978 at 7:17 p. m., Biddeford police officers Gaudette and Marcoux arrested appellant Simoneau at his home, following a shooting spree. Appellant's stepdaughter was killed.

Officer Gaudette handcuffed appellant and placed him in the back seat of a police cruiser. Taking a position in the cruiser's front seat, Gaudette gave appellant each of the four warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After each warning was given, Gaudette asked the appellant whether he understood. On each occasion Simoneau nodded his head in a manner which Officer Gaudette took to be an affirmative response. Following the *Miranda* warnings, Gaudette asked the appellant whether he wished to speak to the police without having a lawyer present. Again appellant nodded. Gaudette, however, made no further attempt to question the appellant, intending to do so at police headquarters.

When the windshield wipers in Gaudette's cruiser malfunctioned, Simoneau was transferred to another cruiser and taken to the Biddeford Police Station. Gaudette testified that he and the appellant arrived at the station at approximately 7:35 p. m., whereupon they met Detective Sergeant Peter Hall. Immediately upon arrival, Gaudette and Hall removed appellant's handcuffs and began a preincarcerative search of appellant's person.

While the handcuffs were being removed in a hallway in the cell block, Police Chief Adelbert Morin, who had been called to the station[1] as a result of the reported shooting,[2] looked into the area and saw appellant and the two officers. Appellant and Chief Morin had known each other for some fifteen or twenty years. Morin then entered the cell block, whereupon appellant said "*Hi, Al;*" Morin responded, "*Hi*", and then "*What's going on?*" The latter inquiry was directed down the cell block hallway toward both the officers and the appellant.

In response to this inquiry Simoneau said, "*I wanted to make a massacre.*" Morin then asked, "*What do you mean, a massacre?*" to which Simoneau replied, "*I wanted to kill everyone in the family including my father-in-law and brother-in-law.*"[3] Simoneau then requested medication and a lawyer, which Morin provided. *Miranda* warnings had not been repeated during the approximately 20-minute period between Gaudette's initial warnings and Simoneau's inculpatory statements to Morin.

## II.

Having failed to file a pretrial motion to suppress testimonial evidence, appellant objected during the testimony of the State's first witness to the introduction of the statements to Chief Morin.[4] A voir dire examination of Officer Gaudette and Chief Morin was then conducted in the absence of the jury, at the conclusion of which the presiding Justice overruled the objection. The Justice's ruling that *Miranda* did not require suppression of the statements was based on his alternative conclusions that appellant had knowingly waived his *Miranda* rights, but that in any event *Miranda* was inapplicable since Chief Morin's inquiry did not constitute "*interrogation*" within the meaning of *Miranda*.[5]

---

1. Morin was summoned to the station at 7:26 p. m., and arrived at 7:32 p. m. Gaudette testified that he and appellant arrived at approximately 7:35 p. m., and that Morin spoke to them at approximately the same time.

2. Morin testified that at the time he saw the appellant with Officers Gaudette and Hall he had not connected Simoneau with the shooting which had been reported to him.

3. Detective Hall testified that Simoneau had replied, "*I wanted to kill by whole family. I wanted to kill them all including by father-in-law and brother-in-law and if my 32 caliber hadn't jammed I would have killed them all.*"

4. Our disposition of this appeal does not require us to determine whether our ruling in *State v. Bishop*, Me., 392 A.2d 20 (1978) that a motion to suppress physical evidence must be made pretrial should be extended to motions to suppress testimonial evidence. *See State v. Hazelton*, Me., 330 A.2d 919, 921–22 (1975); *Cf. State v. Gagnon*, Me., 383 A.2d 25, 27 (1978) (Suppression of criminal record).

5. The presiding Justice stated his rulings as follows:

 ". . . *Communication can be by means other than the spoken words. There is non-verbal as well as verbal communication. If Mr. Simoneau, from the testimony of Officer Gaudette, in the same time span, that the Miranda statements, advisory and concomitant inquiries were being made of Mr. Simoneau, with the testimony of Mr. Gaudette concerning the concurrent acquiescence by the nodding of the head, there was other conduct by Mr. Simoneau's responses to direction that Mr. Gaudette was given. Again, without a spoken word, if the testimony to this point had indicated that Mr. Simoneau gave no response to reaction, physical or otherwise, there would be no basis for saying there was an apparent understanding of the Miranda warning. In light of the other conduct, going on at that time, the affirmative nod of the head with its customary meaning is an indication of understanding and acquiescence. This was given sometime after 17 after 7, if I remember the testimony of Mr. Gaudette, as to either when he received the call or arrived at Granite Street. This colloquy took place at 1935, which was just a matter of some minutes after that time so it was still within the prophylactic effect of the warning. While it might have been better if the chief had made inquiry during the time of the fact it had been given but gratuitously found out about it afterwards, there is another aspect in there also, that is the voluntary indication. The question that had been asked was not of an interrogative type of question. It could have been responded to in many other ways but for some reason, it was not. It was not the circumstance and question, police interrogation consists of, and a voluntary type statement, as this, is admissible even absent Miranda warning; however, here the Miranda warning was within the time frame of the conversation. Your objection is overruled.*" (T. 59–60).

### III.

We deny the appeal on the ground that *Miranda* was inapplicable. Accordingly, we do not reach the issue of waiver presented and accepted below.

The prophylactic measures prescribed by *Miranda* must be shown to have been taken when the State seeks admission of a statement *"whether exculpatory of inculpatory stemming from custodial interrogation . . .,"* 384 U.S. at 444, 86 S.Ct. at 1612. By *"custodial interrogation,"* the Court said, it meant *"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.*[6] There is no dispute but that, at all relevant times in the case, appellant was in the custody of the police. What is decisive, however, is that the questioning challenged by the appellant did not rise to the level of *"interrogation"* which triggers the requirements of *Miranda.*

The emphasis of the majority in *Miranda* on the coercive interrogation techniques then allegedly being routinely employed by the nation's law enforcement personnel[7] underscores the aim of the required warnings: that the will of the suspect in custody not be overborne by physical or psychological duress such as would force a statement he would not otherwise offer. Accordingly, the Court also made clear that *"[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."* 384 U.S. at 478, 86 S.Ct. at 1630. The task, then, is to determine whether the statement sought to be admitted was produced by police *"interrogation"*.

The body of case law discussing what constitutes *"custodial interrogation"* is unusually large; *Miranda* has quickly become perhaps the most oft-cited decision in our criminal jurisprudence. Initially, it is clear that voluntary, spontaneous statements made by a detainee to police in the absence of a prior question or statement by police are not subject to a *Miranda* challenge. *Miranda v. Arizona, supra,* 384 U.S. at 478, 86 S.Ct. 1602. We have so held on several occasions, *State v. Lewis,* Me., 373 A.2d 603, 608 (1977); *State v. Farley,* Me., 358 A.2d 516, 519 (1976); *State v. Taylor,* Me., 343 A.2d 11, 19 (1975); *State v. Lafferty,* Me., 309 A.2d 647, 655 (1973).

Although the statement here sought to be suppressed, unlike those cited above, followed a direct police inquiry,[8] the rule has emerged since *Miranda* that brief, neutral questions which are not part of an effort to elicit a confession or admission do not constitute *"interrogation."* Responses to such questions are therefore not excluded by the lack of adequate *Miranda* warnings. Brief, routine questions posed to a suspect during *"booking"* procedures, for example, do not constitute *"interrogation."*[9] So, too, threshold or clarifying questions—neutral questions posed by police in response to an ambiguous statement by a suspect—do not constitute interrogation. *See State v. Taylor, supra,* 343 A.2d at 19–20; *State v. Armstrong,* Me., 344 A.2d 42, 50–51 (1975). Further, questions asked in the wake of an event or occurrence which would naturally tend to evoke such an inquiry do not constitute interrogation. These questions, unlike the sort of interrogation which prompted

---

6. In a footnote to this passage the Court observed:

> This is what we meant in *Escobedo [v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)] when we spoke of an investigation which has focused on an accused.*

384 U.S. at 444 n. 4, 86 S.Ct. at 1612 n. 4.

7. *See* 384 U.S. at 445–458, 86 S.Ct. 1602.

8. Although it is not clear that the inquiry was addressed to the defendant, there being several people in the area, we assume *arguendo* that it was, finding the question not determinative.

9. *See, e.g., U. S. v. Prewitt,* 553 F.2d 1082, 1085–86 (7th Cir. 1977), *cert. den.,* 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977); *U. S. v. Grant,* 549 F.2d 942, 946–57 (4th Cir. 1977); *U. S. ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. den.,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *U. S. v. Menichino,* 497 F.2d 935, 940–41 (5th Cir. 1974); *But see Proctor v. U. S.,* 131 U.S.App. D.C. 241, 404 F.2d 819, 820–21 (1968).

implementation of the *Miranda* safeguards, are characterized by brevity, neutrality and absence of an intent to elicit a confession or admission. Most, moreover, are typically spontaneous.[10] *See, e. g., State v. Franco*, Me., 365 A.2d 807, 811–812 (1976) (at close of initial appearance, U.S. Magistrate asked if defendant wished to speak; response was later sought to be suppressed under *Miranda*). The language of the Supreme Court of New Jersey in *State v. Barnes*, 54 N.J. 252, 252 A.2d 398 (1969) is apropos to the instant case. These police had staked out a Newark streetcorner, awaiting the defendant, an escapee from a women's reformatory. Stopping and seizing her car, an officer saw loose checks scattered on the floor of the vehicle, and asked *"Whose stuff is this?"* Defendant admitted ownership and was convicted of receiving stolen goods. The Court held she had not been *"subjected to questioning"* within the meaning of *Miranda*:

> What was comprehended by *Miranda* was a process of "custodial interrogation" which the Supreme Court found to be inherently coercive. The single question asked in this case was not part of the investigation which led to the defendant's apprehension, nor was it one of a series of investigatory queries. *Most important, it was not the type of question which centered blameworthiness on the defendant. She could have attributed possession to anyone, or to no one, in answer to the question directed at her. After all,* there were *three other occupants* in the car. . . . were the officer to have asked the defendant the kind of question which called for an admission of guilt, we might draw a different conclusion. *But here the question was open-ended in its form,* not focusing on any particular suspect, and unrelated to the cause of her arrest as an escapee.
>
> *There is no suggestion that prior to the defendant's arrest the police had any inkling that the defendant was connected with stolen checks,* or that any checks had

been stolen. . . . *It seems clear to us that the essence of the situation was not an officer imposing a process of interrogation upon a suspect, but an officer reacting naturally and spontaneously to the scene before him.* See Allen v. United States*, 129 U.S.App.D.C. 61, 64, 390 F.2d 476, 479 (1968).

252 A.2d at 401 (Emphasis added).

■ In the instant case, Chief Morin's brief and neutral question was a natural reaction to the sight of a long-time acquaintance being held in custody. His inquiry, *"What's going on?"* did not constitute interrogation. *See Jackson v. State*, 143 Ga. App. 734, 240 S.E.2d 180, 181 (1977) (*"What happended?"*); *State v. Bennett*, 30 Utah 2d 343, 517 P.2d 1029, 1031 (1973) (same); *Cork v. State*, 50 Ala.App. 670, 282 So.2d 107, 111–112 (1973) (same); *State v. Chambers*, 84 N.M. 309, 502 P.2d 999, 1002 (1972) (same); *State v. Billings*, 84 Nev. 55, 436 P.2d 212, 213 (1968) (*"What's the trouble?"*); *People v. Ashford*, 265 Cal.App.2d 673, 71 Cal.Rptr. 619, 627–28 (1968) (*"How's it going, Ashford?"*); *People v. Paton*, 255 Cal.App.2d 347, 62 Cal.Rptr. 865, 867 (1967) (*"What happened?"*). See also, State v. Phillips*, 37 N.C.App. 202, 245 S.E.2d 587, 589 (1978) (paraphrase: *"What's going on?"*); *Annot.*, 31 A.L.R.3d 565, 676–696.

■ Chief Morin's clarifying question (*"What do you mean, a Massacre?"*) also falls within the class of brief, spontaneous reactions to an ambiguous statement or occurrence in which

> the law enforcement officer [is] not interrogating [defendant] for the purpose of obtaining evidence to establish [his] guilt of a crime, but rather [is] seeking to determine the nature of the situation confronting him . . . .

*Jackson v. State, supra*, 240 S.E.2d at 181. *See also, United States v. Miles*, 440 F.2d 1175, 1176 (5th Cir. 1971); *Campbell v.*

---

**10.** The American Law Institute's Model Code of Pre-Arraignment Procedure would specifically exclude *"non-investigative"* questioning from the ambit of *Miranda*. A.L.I., *Model Code of Pre-Arraignment Procedure*, § 140.8(5) (1974).

*State,* 4 Md.App. 448, 243 A.2d 642 (1968); *Newhouse v. State,* 420 S.W.2d 729 (Tex.Cr. App.1967); *People v. Mercer,* 257 Cal. App.2d 244, 64 Cal.Rptr. 861, (1967); *cf. State v. Davis,* 261 Iowa 1351, 157 N.W.2d 907 (1968) (response to jest by guard).

Having carefully examined the transcript of the voir dire proceedings, we find ample evidence providing rational support for the conclusion of the trial Justice that no "*interrogation*" was shown. *State v. Farley, supra,* 358 A.2d at 519.

The entry is:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., did not sit.