**STATE of Maine**

v.

**Thomas DUREPO.**

Supreme Judicial Court of Maine.

Argued Sept. 22, 1983.

Decided Feb. 28, 1984.

Gene Libby, Dist. Atty., Michael E. Saucier, Asst. Dist. Atty. (orally), Alfred, Brett Dwight Baber, Law Student, for plaintiff.

Mark A. Kearns (orally), East Lebanon, Roger P. Flaherty, Sanford, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and GLASSMAN, JJ.

WATHEN, Justice.

The defendant, Thomas Durepo, appeals from a judgment of the Superior Court (York County) entered in accordance with a jury verdict finding him guilty of attempted murder, 17–A M.R.S.A. §§ 152–201 (1983), and aggravated assault, 17–A M.R.S.A. § 208 (1983). Durepo contends first, that the Superior Court erred in failing to suppress as involuntary all portions of a statement he made to a Sanford police officer implicating him in the above offenses, and second, in allowing the prosecution to use the suppressed portions of the state-

ment to impeach his credibility at trial. We deny the appeal.

The jury would have been justified in finding the following facts. On August 1, 1981, David Nalibow, a security guard at Brooks Woolen Mill in Sanford received severe and permanent injuries as a result of a beating with a "picker rod." During the course of an intense investigation to identify the perpetrator, police questioned the defendant, Thomas Durepo, who denied knowledge of the beating.

On April 26, 1982, Durepo contacted the Sanford police in regard to an unrelated crime. Having come to the station voluntarily, Durepo implicated himself in receiving stolen goods. While at the police station, Durepo came in contact with Officer Gordon Paul, who was investigating the Nalibow beating.[1] Paul advised Durepo of his *Miranda* rights, and following a valid waiver, the two began discussing the Nalibow incident.[2] Although Durepo appeared sober and in good health, he began to cry after Officer Paul showed him a picture of Nalibow which had been taken before the beating.

For most of the interrogation, Paul provided the details of the crime and Durepo provided short, often inaudible answers. Durepo admitted to being in the mill yard, drunk, the day Nalibow was beaten, to entering the guard shack through an unlocked door, to encountering someone therein and asking for some beer, and then to having hit that person after having been refused. Although Durepo initially stated that he punched the guard, when asked if he hit him with a pipe, he admitted to having struck him "with something" found in the guard shack. At this point, Durepo stated he did not wish to talk. Officer Paul, however, persisted in questioning the defend-

---

1. Durepo was aware that Paul was investigating the Nalibow beating, as Paul had previously questioned Durepo about the incident on at least two occasions.

2. The defendant and Officer Paul were interrupted shortly after they began discussing the Nalibow beating. As a result, Durepo and Paul moved to an interviewing room. Without Durepo's knowledge, Paul turned on a tape recorder to record the interview. Parts of the recorded statement were used at trial to impeach the defendant's credibility.

ant, who made several more incriminating remarks.

After indictment on charges of attempted murder and Class A theft,[3] Durepo filed a motion to suppress as involuntary and violative of *Miranda* the statement he made to Officer Paul. The motion justice, finding a violation of Durepo's *Miranda* rights, suppressed the portion of Durepo's statement Officer Paul solicited after the defendant declared he no longer wished to talk. The court, however, found Durepo's entire statement to be voluntary. The motion justice reasoned that Durepo had come to the station on his own while sober and not under arrest. Further, the court observed that Durepo had not been physically coerced and had been apprised of his *Miranda* rights. The court found Durepo's statement to be voluntary.

Prior to the defendant's trial, but after the suppression hearing, a York County Grand Jury indicted the defendant on a third count stemming from the Nalibow beating—aggravated assault in violation of 17–A M.R.S.A. § 208. All three counts were tried together beginning February 14, 1983. During the course of the trial, Durepo took the stand in his own defense and denied involvement in the Nalibow beating. Durepo testified that he admitted involvement to Officer Paul because he was depressed, needed a place to stay, and wanted his girlfriend to feel sorry for him. Durepo asserted he would not have been able to relate the events of the offense had Officer Paul not provided the details of the crime during the interrogation.

A. *The Voluntariness of Durepo's Statement*

▮ In order for a confession to be admitted at trial, the state must prove beyond a reasonable doubt that it was made

voluntarily.[4] *State v. Ledger,* 444 A.2d 404, 413 (Me.1982); *State v. Ashe,* 425 A.2d 191, 194 (Me.1981); *State v. Collins,* 297 A.2d 620, 636 (Me.1972). A trial court's ruling on the admissibility of a confession will not be disturbed on appeal if the record rationally supports the conclusions reached. *State v. White,* 460 A.2d 1017, 1021 (Me.1983); *Ledger,* 444 A.2d at 413. The determination of voluntariness will be upheld unless the evidence shows that a contrary inference was the only reasonable conclusion that could have been drawn. *Ledger,* 444 A.2d at 413; *State v. Catlin,* 392 A.2d 27, 30 (Me.1978).

▮ In the instant case, the record lends rational support to the determination below that the statement Durepo made to Officer Paul was voluntary. Although Durepo was crying, crying alone is "insufficient to negate the conclusion that statements were voluntary." *White,* 460 A.2d at 1021. Moreover, Durepo came to the Sanford police station voluntarily, while sober and in apparent good health, and was apprised of, understood, and effectively waived his *Miranda* rights prior to questioning. *See Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969) (fact that suspect is given, understands, and waives *Miranda* rights prior to making incriminating statement is indicative of voluntariness); *see also State v. Theriault,* 425 A.2d 986, 990 (Me.1981) (where defendant approached police voluntarily and was given *Miranda* warnings three times, his confession was voluntary despite officer's statements "you'll feel better if you get it off your chest"). Finally, Durepo was questioned by only one officer, readily accompanied that officer to the interviewing room, and was allowed to walk around and smoke cigarettes during the course of the interview. Having examined the totality of the circumstances, we hold the record rationally

---

**3.** Durepo was found not guilty of theft.

**4.** The requirement that a confession be voluntary before being used at trial is fundamental to due process of law. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). *See generally State v. Mikulewicz,*

462 A.2d 497, 500 (Me.1983) (discussing values served by voluntariness requirement); Grano, *Voluntariness, Free Will, and the Law of Confessions,* 65 Va.L.Rev. 859, 896–924 (1979) (discussing voluntariness requirement).

supports the determination of the suppression justice that Durepo's confession was voluntary.

B. *The Use of the Suppressed Portion of Durepo's Statement to Impeach Credibility*

On appeal, the defendant contends for the first time he was deprived of a fair trial by the prosecution's use of the suppressed portions of his statement for purposes of impeachment. Defendant did not object in any way to the use of the suppressed statements at trial and our review is confined to "obvious error." In his brief and argument before this Court he does not raise any issue under the Maine Constitution but, rather, he argues solely that the state's cross-examination was not "reasonably suggested" by the direct examination of defendant. The only function to perform on this appeal is an application of the settled law of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), to the facts presented.[5]

In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court declared that *Miranda* did not stand for the proposition that statements obtained in violation of the *Miranda* rule were inadmissible at trial for all purposes. *Id.* at 224, 91 S.Ct. at 645. Rather, the *Harris* Court held, *Miranda* mandated only that the prosecution be barred from the use of illegally obtained statements in its case-in-chief. As long as the statements elicited in violation of *Miranda* satisfied traditional legal standards of trustworthiness, the prosecution was free to use such statements to impeach a criminal defendant's direct testimony.[6] *Id.* at 224–26, 91 S.Ct. at 645–646. The Court explained that the right of a criminal defendant to take the stand in his own defense cannot be construed to include the right to commit perjury. *Id.* at 225, 91 S.Ct. at 645. The Court observed: "[T]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from risk of confrontation with prior inconsistent utterances." *Id.* at 226, 91 S.Ct. at 646. Finally, the Court postulated that sufficient deterrence of unlawful police activity flowed from the exclusion of *Miranda* violative statements from the prosecution's case-in-chief. The benefits of the impeachment process should not be lost, proclaimed the court, "because of the speculative possibility that impermissible police conduct will be encouraged thereby."[7] *Id.* at 225, 91 S.Ct. at 645.

In *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), air-

---

5. This Court has never adopted an equivalent to the *Miranda* rule or held that a violation of the *Miranda* safeguards requires application of an exclusionary rule as a matter of state constitutional law. We have previously referred to the exception created by *Harris* with approval. *State v. Melvin,* 390 A.2d 1024, 1032 n. 4 (Me. 1978); *State v. Marin,* 353 A.2d 746, 748 (Me. 1976); *State v. Myers,* 345 A.2d 500, 502 (Me. 1975). In *Melvin* the defendant argued that the state Constitution required the rejection of the *Harris* impeachment exception and we held the argument to be foreclosed by the two earlier decisions. We noted:

> It is also important to recognize that under the Federal Constitution the *Miranda* "procedural safeguards" are "not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *Id.*

6. In *Harris,* the defendant, charged with twice selling heroin to an undercover police officer, testified on direct examination that the actual substance he sold to the officer was baking powder and not heroin. *Harris,* 401 U.S. at 223, 91 S.Ct. at 644. During cross-examination, the prosecutor asked the defendant whether he made certain statements to the police which partially contradicted his direct testimony. *Id.* Previously, these statements had been suppressed because of a failure to apprise the defendant of his right to counsel. The trial judge instructed the jury that the statements could be considered only as affecting the defendant's credibility. *Id.*

7. The Supreme Court reaffirmed *Harris* in *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), emphasizing the "search for truth" in the criminal justice system. *Id.* at 722–24, 95 S.Ct. at 1220–1221.

port customs officials illegally seized from the defendant's luggage a T-shirt which implicated the defendant in smuggling cocaine into the United States. During direct examination, the defendant denied any involvement in the smuggling operation. *Id.* at 622, 100 S.Ct. at 1914. Although the defendant did not refer to the T-shirt during direct examination, the prosecutor inquired during cross-examination whether the defendant possessed the T-shirt at the time he went through customs. *Id.* at 623, 100 S.Ct. at 1914. After Havens denied possession, the prosecution called in rebuttal the customs official who had seized the T-shirt. Therefore, the Supreme Court was confronted with a question left unanswered in *Harris*—the permissibility of the use of evidence obtained in an unlawful search and seizure to impeach statements made by a defendant for the first time during cross-examination.

Stressing the importance of arriving at the truth in criminal proceedings and the need to discourage perjury, the *Havens* Court observed, "[w]e see no difference of constitutional magnitude between the defendant's statement on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." *Id.* at 627, 100 S.Ct. at 1916. Accordingly, the Court held:

> [A] defendant's statements made in response to proper *cross-examination reasonably suggested by the defendant's direct examination* are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt.

*Id.* at 627–28, 100 S.Ct. at 1916–1917.[8] (emphasis added)

The benefits of the *Harris-Havens* rule are clear. Allowing the use of suppressed evidence for the limited purpose of impeachment prevents a situation in which a criminal defendant may take the stand, willfully commit perjury, and be free from fear that the perjured testimony will be exposed. As a result, an important objective of the criminal justice system, the search for truth, is facilitated.

■ Applying the *Harris-Havens* analysis to the present case, defendant argues that the state's cross-examination was not "reasonably suggested" by defendant's direct testimony. On direct examination, in apparent anticipation of the state's use of the suppressed statements, defendant stated that he lied to the officer concerning his involvement in the incident and that he was able to answer the officer's questions only because the officer furnished him all the necessary details. During cross-examination, the prosecutor elicited the following testimony:

Q. He [the officer] led you around?

A. Yes, sir.

Q. He told you the answers?

A. Yes, sir.

Q. And you just agreed with him?

A. Mostly, yes.

Q. Mostly?

A. Right.

Q. You just agreed with him. *So you wouldn't be able to tell Detective Paul things about that crime which were not known to anybody else by the police and the person who did it, could you?*

A. *Right, right.* (emphasis added).

The cross-examination was "reasonably suggested" by defendant's direct testimony. He confirmed his direct testimony that he did not provide details of the crime beyond those suggested to him by the officer. The prosecutor then questioned defendant with respect to portions of his suppressed statement to the officer which tended to contradict his testimony that he provided no de-

---

8. The *Havens* Court did not draw a distinction for purposes of the impeachment exception to the exclusionary rule between the use of illegally seized evidence (a Fourth Amendment violation) and unlawfully obtained statements pursuant to the Fifth Amendment.

tails of the crime on his own. Because the cross-examination was reasonably suggested by defendant's direct testimony and was relevant, his response was subject to impeachment and no error was committed in admitting the suppressed statements for that purpose.

The entry must be:

Judgments of conviction affirmed.

McKUSICK, C.J., and VIOLETTE, J., concurring.

ROBERTS, Justice, with whom NICHOLS, Justice, joins, concurring.

I join the opinion of the court in its entirety. I write separately to express my view that we are bound by the decisions of the Supreme Court in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) and *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) and to agree with our dissenting colleague that those decisions erode the exclusionary rule.

Although we are free to accord a defendant greater protection under state law than required by the United States Constitution, we are not confronted in this case with the use for impeachment of a statement obtained in violation of a Maine constitutional rule as was the statement in *State v. Collins,* 297 A.2d 620 (Me.1972). Rather, the statement was found by the trial court to have been voluntary, but obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Had we previously adopted as a matter of Maine constitutional law the *Miranda* requirements or were we to do so now, I would agree that we could reject the *Harris-Havens* principle. We have not adopted *Miranda* and I do not advocate that we do so. I am, therefore, in agreement with the Court's opinion.

Until an appropriate occasion arises for us to consider the use for impeachment of evidence excluded upon state grounds, I am

not prepared to endorse the *Harris-Havens* rationale. There is merit in the observation of the dissenting justice that the use for impeachment of the fruits of police misconduct provides too great an incentive for such misconduct. We should avoid a return to the "good old days" when law enforcement was occasionally as "lawless" as the subject of its investigations.

GLASSMAN, Justice, concurring in part and dissenting in part.

I join part A of the majority opinion, which holds that the record rationally supports the finding of the suppression justice that Durepo's statement to Officer Paul was voluntary. Believing, however, that the *Harris-Havens* rule works a fundamental deprivation of rights guaranteed by article VI of the Maine Constitution, I cannot join in part B. I would hold as a matter of state constitutional law that statements suppressed as a result of a *Miranda* violation may not be used at trial to impeach a defendant's credibility.

Article I, section 6 of the Maine Declaration of Rights provides in part, "In all criminal proceedings, the accused . . . shall not be compelled to furnish or give evidence against himself . . . ." Me. Const. art. I, § 6. *Compare* U.S. Const. amend. 5 (no person shall be compelled to be witness against himself). We have recognized that article I, section 6 is similar in nature and purpose to the federal privilege against self-incrimination, and therefore, that precedent with respect to construction of one may serve as precedent for construction of the other. *State v. Vickers,* 309 A.2d 324, 326 (Me.1973); *Gendron v. Burnham,* 146 Me. 387, 395, 82 A.2d 773, 780 (1951). This principle, however, is not an absolute. In *State v. Caouette,* 446 A.2d 1120 (Me. 1982), we observed that federal decisions do not furnish a complete statement of controlling law, but rather "delineate a constitutional minimum or universal mandate for the federal control of every state."[1] *Id.* at

1. We are free, of course, to accord an accused   in a criminal proceeding greater protections

1122. Therefore, we stated that the maximum statement of the substantive content of the privilege against self-incrimination must be decided as a matter of Maine constitutional law. *Id.* Accordingly, we reaffirmed our decision in *State v. Collins,* 297 A.2d 620 (Me.1972), in which we held that the Maine Constitution requires as a prerequisite to the admissibility of a confession that the state prove beyond a reasonable doubt the confession was voluntary, even though the United States Constitution requires only that voluntariness be established by a preponderance of the evidence. *Compare Collins,* 297 A.2d at 625–27 *with Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (prosecution must show voluntariness of confession by preponderance of evidence). A departure from the federal *Harris-Havens* rule is similarly warranted in the instant case.

Although I do not disagree with the majority's assertion that the use of trustworthy suppressed evidence for the purpose of impeachment facilitates the search for truth, *see ante* p. 923, our system of government, to preserve the rights of all persons accused of crime, maintains a number of countervailing values which in some instances mandate that all evidence potentially available to the state against an accused not be used. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Because the detriments of the *Harris-Havens* rule clearly outweigh the benefits, I would uphold the rights of those accused of crime to have evidence obtained against them in violation of *Mi-*

*randa* excluded from trial for all purposes. I now turn to a review of the criticisms of the *Harris-Havens* rule.

The constitutional argument against the use of *Miranda*-violative statements to impeach one accused of a crime was outlined by Justice Brennan in his dissenting opinion in *Harris.* Justice Brennan, writing for three of the four dissenters,[2] argued that the privilege against self-incrimination is satisfied only when an accused is guaranteed the absolute right to remain silent, " 'unless he chooses to speak in the *unfettered* exercise of his own will.' " *Harris v. New York,* 401 U.S. 222, 230, 91 S.Ct. 643, 647, 28 L.Ed.2d 1 (1971) (Brennan, J., dissenting) (quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964)) (emphasis in *Harris* ). The choice to testify is an exercise of the constitutional privilege, and therefore, must be "unfettered." When threatened by the use of an illegally obtained statement to impeach, the choice is no longer wholly free.[3] *Id.; see Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965) (prosecutorial comment on accused's failure to take stand or court instruction that such failure is evidence of guilt impermissibly "fetters" choice whether to testify in own behalf). Therefore, Justice Brennan argued, the Fifth Amendment privilege against self-incrimination is secure only when illegally obtained evidence is excluded from trial for all purposes.

The second major criticism of the impeachment exception to the exclusionary

---

under the Maine Constitution than those offered by the United States Constitution. *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 389 *passim* (1977) (discussing state court activism in the area of protection of individual rights).

2. Justice Black dissented without opinion.

3. Additionally, Justice Brennan argued that the issue before the Court in *Harris* had been settled in *Miranda,* where the Court stated:

The privilege against self-incrimination protects the individual from being compelled to incriminate himself in *any* manner .... [S]tatements merely intended to be exculpatory by the defendant are often *used to impeach his testimony at trial ....* These *statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.*

*Harris,* 401 U.S. 222, 230–31, 91 S.Ct. 643 (1971) (quoting *Miranda,* 384 U.S. at 476–77, 86 S.Ct. 1602, 1628–1629, 16 L.Ed.2d 694) (emphasis in *Harris* ).

rule focuses on the rationale underlying the rule itself. Having its origins in both the Fourth and Fifth Amendments, the exclusionary rule was designed to serve two important societal interests. First, the rule was deemed necessary to maintain the integrity of the judicial system. If the courts allowed the use at trial of illegally obtained evidence, they would, in effect, acquiesce in the illegality, and thus become an "accomplice in the willful disobedience of a Constitution they are sworn to uphold." *Elkins v. United States,* 346 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). Second, if illegally obtained evidence was admitted at trial, the police would have little incentive to conform their conduct to the requirements of law. *United States v. Janis,* 428 U.S. 433, 446–47, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); *Stone v. Powell,* 428 U.S. 465, 484–86, 96 S.Ct. 3037, 3047–3048, 49 L.Ed.2d 1067 (1976). The latter rationale has emerged as the primary justification for the exclusionary rule. *Janis,* 428 U.S. at 436, 96 S.Ct. at 3023; *United States v. Peltier,* 422 U.S. 531, 536, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374 (1975).[4]

Critics of *Harris* and its progeny argue that the impeachment exception jeopardizes the underlying rationale of the exclusionary rule. The *Harris* dissenters observed, "it is monstrous that courts should aid or abet the law-breaking police officer." *Harris,* 401 U.S. at 232. Quoting Justice Clark in *Mapp v. Ohio,* the dissenters wrote, " '[N]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' " *Harris,* 401 U.S. at 232, 91 S.Ct. at 649 (Brennan, J., dissenting) (quoting *Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961)). Equally important, courts and commenta-

tors have argued that the *Harris-Havens* rule actually encourages police officers to disregard a suspect's invocation of the right to remain silent. *E.g., Oregon v. Hass,* 420 U.S. 714, 725, 95 S.Ct. 1215, 1222, 43 L.Ed.2d 570 (1975) (Brennan, J., dissenting); Dershowitz and Ely, *Harris v. New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority,* 80 Yale L.J. 1198, 1219–21 (1971); 85 Harv. L.Rev. 44, 52 (1971). These critics have depicted the following scenario: An individual, suspected of a serious crime, is arrested and given his *Miranda* warnings. Although the suspect communicates his desire not to answer questions until he has spoken with counsel, the police, aware that any minimally competent counsel will advise the suspect to remain silent,[5] interrogate the suspect in knowing violation of *Miranda.* The police simply have nothing to lose, and much to gain. Any inculpatory statement made, although obtained illegally, may be used to impeach the suspect if he chooses to testify at trial. *Hass,* 420 U.S. at 725, 95 S.Ct. at 1222; *State v. Deatore,* 70 N.J. 100, 123 n. 2, 358 A.2d 163, 176 n. 2 (1976) (Pashman, J., concurring and dissenting); Dershowitz and Ely, *supra,* at 1219–21.

Third, critics of the *Harris-Havens* impeachment exception to the exclusionary rule argue that a jury is unable to distinguish properly between the use of suppressed evidence for impeachment purposes and its use as substantive proof of guilt. *People v. Disbrow,* 16 Cal.3d 101, 112, 127 Cal.Rptr. 360, 367, 545 P.2d 272, 279 (1976); 3 W. LaFave, *Search and Seizure* § 11.6, at 708–09 (1978 & Supp.1983); Dershowitz and Ely, *supra,* at 1216; Note, *United States v. Havens, Impeachment by Illegally Obtained Evidence,* 446 U.S. 620, 100 S.Ct. 1912, 64

---

4. Accordingly, the Supreme Court has refused to exclude evidence obtained in violation of the Constitution when exclusion would not have a deterrent effect. *See, e.g., United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1975) (grand jury proceedings); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (federal habeas corpus proceedings).

5. *See Watts v. Indiana,* 338 U.S. 49, 59, 69 S.Ct. 1357, 1358, 93 L.Ed. 1801 (1949) (Jackson, J., concurring) ("any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances").

L.Ed.2d 559, 32 Syracuse L.Rev. 637, 673 (1981). These critics note that empirical studies have concluded that limiting instructions do not sufficiently negate the danger that a jury might consider illegally obtained evidence as part of the state's case-in-chief. H. Kalven & H. Zeisel, *The American Jury* 127–28, 177–80 (1966); Kalven, *A Report on the Jury Project of the University of Chicago Law School,* 24 Ins. Counsel J. 368, 371 (1957). The Supreme Court has itself acknowledged the inability of a jury to disregard highly inculpatory evidence even when instructed to so do. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court observed, "There are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135, 88 S.Ct. at 1627; *see also Jackson v. Denno,* 378 U.S. 368, 382–83 and n. 10, 84 S.Ct. 1774, 1783–1784 and n. 10, 12 L.Ed.2d 908 (1964).

Finally, commentators argue that the dangers posed by the *Harris* rule, *i.e.,* illegally obtained evidence may be used to impeach an accused's direct testimony, are greatly exacerbated by the *Havens* rule, *i.e.,* tainted evidence may be used to impeach statements elicited for the first time during cross-examination. *LaFave, supra,* § 11.-6(a) at 703–05; Note, *The Exclusionary Rule: Impeachment Exception Broadened to Include Statement Elicited Upon Cross-Examination—United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559, 30 DePaul L.Rev. 225, 238–40 (1980); Case Note, *Impeachment by Unconstitutionally Obtained Evidence—The Erosion of the Exclusionary Rule, People v. Taylor*—8 Cal.3d 174, 501 P.2d 918, 104 Cal.Rptr. 350 (1972), 34 Ohio St.L.J. 706 (1973) [hereinafter cited as *Erosion of Exclusionary Rule*]. The choice to take the stand in one's own defense is more "fettered" under *Havens* than under *Harris.* Under *Harris,* defense counsel could carefully control the areas of questioning to guard against eliciting responses at odds with suppressed evidence. *Havens* allows a prosecutor to design questions for the sole purpose of laying a foundation for the introduction of illegally obtained evidence. If the defendant testifies and, even in a general manner, denies the accusation against him, he faces the almost sure introduction of illegally obtained evidence. As a result, the defendant is further discouraged from taking the stand in his own defense.

Moreover, allowing the use of illegally obtained evidence to impeach statements made for the first time during cross-examination further undermines the exclusionary rule. The integrity of the judiciary is called into question in a system which sanctions the use of unconstitutionally obtained evidence, requiring as the sole prerequisite that the prosecution, bringing all its expertise and power to bear, elicit testimony inconsistent with a previously suppressed statement. Additionally, under *Havens,* the police have a further incentive to disregard a suspect's invocation of the right to remain silent, given the ease with which illegally obtained evidence may subsequently be used at trial. *See Erosion of Exclusionary Rule, supra,* at 704–05, 100 S.Ct. at 1959–1960.

Having reviewed the arguments for and against allowing the use of illegally obtained evidence to impeach one charged with a crime, I would reject the *Harris-Havens* rule as a matter of the Maine Constitution. Although the search for truth in a criminal trial is the worthiest of goals, and although I abhor the thought that a defendant in a criminal case might use *Miranda* as a shield to insulate himself from the exposure of perjured testimony, I cannot subscribe to a rule which significantly discourages one from testifying in one's own defense, calls into question the integrity of the judicial system, encourages the police, in the custodial interrogation context, to violate deliberately the invocation of the right to remain silent, and creates the very real danger that a jury will consider unconstitutionally obtained evidence as substantive proof of guilt. I find intoler-

928

able this fundamental erosion of constitutional rights. Accordingly, I would join the courts of California, Hawaii, and Pennsylvania, and reject *Harris* and *Havens* as a matter of state constitutional law. *See People v. Disbrow*, 16 Cal.3d 101, 127 Cal. Rptr. 360, 545 P.2d 272 (1976); *State v. Santiago*, 53 Hawaii 254, 492 P.2d 657 (1971); *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975).

The instant case is illustrative of the dangers posed by the *Harris-Havens* rule. In *Harris*, the Supreme Court termed the notion that impermissible police conduct would be encouraged by its decision a "speculative possibility." *Harris*, 401 U.S. at 225, 91 S.Ct. at 645. The conduct of the police in the instant case tends to show the opposite to be true. After having made several incriminating responses to Officer Paul's questions, Durepo stated he no longer wished to talk. Rather than respecting this invocation of the right to remain silent, Officer Paul stated:

> Tom, look at me. Don't change what you were saying. Ya know you're in trouble. But why stop now? You've already gone over the edge. I told you I could help you. I'm just trying to get the whole story.

The interrogation then continued. Subsequently, Durepo again stated he no longer wished to talk. Officer Paul similarly ignored this request, imploring the defendant for "five more minutes" of talk.

The majority, by sanctioning the use of the statements Durepo made after his invocation of the right to remain silent, in effect, acquiesce in a deliberate violation of his constitutional rights and encourage law enforcement officials to disregard the mandates of law to increase the chance of obtaining a conviction. I would vacate the judgment of conviction and remand to the Superior Court.